Cecelia N. EAGLESTON,
Plaintiff–Appellant,

v.

Daniel GUIDO, Detective Rivera, Dennis Donnelly, Police Officer, Daniel Moore, Police Officer, and James Rooney, Police Officer, Defendants,

Brian K. Bugge, Police Officer, Edward Kopf, Police Officer, Jack Ozer, Police Officer, Dewitt C. Treder, MP Milward, Police Officer, Michael Pesale, Police Officer, Paul Kern, Police Officer, Suffolk County, Suffolk County Police Department, Defendants–Appellees.

No. 1719, Docket 93–9053.

United States Court of Appeals,
Second Circuit.

Argued June 23, 1994.

Decided Dec. 7, 1994.

Bartholomew J. Rebore, Lindenhurst, NY (Rebore, Thorpe & Pisarello, P.C., of counsel), for plaintiff-appellant.

Jeltje deJong, Asst. County Atty., Hauppauge, NY, (Robert J. Cimino, Suffolk Coun-ty Atty., of counsel), for defendants-appellees.

Before: MAHONEY and JACOBS, Circuit Judges.[1]

JACOBS, Circuit Judge:

Plaintiff-appellant Cecelia N. Eagleston alleges under 42 U.S.C. § 1983 that the Suffolk County in the State of New York, and the County's police, deprived her of equal protection of the law under the Fourteenth Amendment by failing to protect her from her husband, Thomas Eagleston, despite her numerous complaints that he was harassing her in violation of two orders of protection. In December 1986, Mr. Eagleston stabbed his wife 30 or more times. Mrs. Eagleston's complaint charges that "defendant, County of Suffolk, acting through its police department, condoned a pattern [or] practice of affording inadequate protection, or no protection at all, to women who have complained of having been abused by their husbands or others with whom they have a close relationship."

Mrs. Eagleston has presented her claim to two juries in the Eastern District of New York; the first trial was conducted by Judge Wexler and the second by visiting Judge Tsoucalas (Court of International Trade, sitting by designation). Both juries deadlocked. At the end of the second trial, Judge Tsoucalas entered an order directing a verdict in favor of the defendants then remaining in the case. Mrs. Eagleston's appeal alleges a variety of errors committed in the course of the proceedings. First, Mrs. Eagleston disputes the district court's conclusion that the statute of limitations had expired on her claims against police officers Bugge, Kopf, Kern and Donnelly. Second, she challenges the dismissal of the defendant police officers Ozer, Pesale and Milward on qualified immunity grounds. Third, she challenges several of Judge Tsoucalas's evidentiary rulings, most notably his refusal to receive in evidence a report prepared by Suffolk County which records a sharp increase after 1987 in the number of domestic incidents resulting in arrest. Fourth, she

1. Honorable David G. Trager of the United States District Court for the Eastern District of New York, who was originally a member of the panel, recused himself prior to oral argument. *See Murray v. National Broadcasting Company, Inc.,* 35 F.3d 45 (2d Cir.1994).

challenges Judge Tsoucalas's order following the second trial, directing a verdict against her and dismissing the complaint against the County of Suffolk and the County's former Police Commissioner, on the ground that Mrs. Eagleston had failed to produce sufficient evidence to support her equal protection claim. Her remaining arguments do not justify extended treatment.

We affirm the judgment.

## BACKGROUND

Mrs. Eagleston's marriage turned violent on October 20, 1986, the day she served her husband with divorce papers. Between then and December 27, 1986, Mrs. Eagleston contacted the police ten times to report harassment and threats against her by Mr. Eagleston. On one occasion, Mrs. Eagleston brought her complaint directly to the police station; on another occasion, a police officer was summoned to a neighborhood restaurant; eight times, police were dispatched to the Eagleston home. During this two month period, Mrs. Eagleston resided on the ground floor of the Eagleston home while Mr. Eagleston sporadically occupied the same house, sometimes with his wife, and sometimes in a basement apartment that the Eaglestons had rented to his sister before divorce proceedings began.[2]

Mr. Eagleston reacted to notice of the divorce proceedings on October 20, 1986 by threatening Mrs. Eagleston, by throwing objects at her and by smashing plasterboard walls in their home. Mrs. Eagleston called the Suffolk County police department, which dispatched officers to the house. The officers concluded that an arrest was not justified.

On October 23, 1986, the Suffolk County Supreme Court issued an Order to Show Cause, returnable on November 3, 1986, which included a "temporary order of protection" requiring Mr. Eagleston "to refrain from any acts of violence" towards Mrs. Eagleston or the Eagleston's son, Steven. A second judge of that court extended this order of protection on November 26, 1986, and temporarily granted Mrs. Eagleston "exclusive use of and occupancy of the marital residence." On November 10, 1986, Mr. Eagleston sought and obtained his own temporary order of protection requiring Mrs. Eagleston to refrain from acts of violence against him.

After the initial incident on October 20, Mrs. Eagleston reported incidents involving her husband to the Suffolk County police on November 7, 9, 20, 23 and December 7, 8, 9, 19 and 24. The police responded to all of these demands for assistance. Most of the complaints did not allege physical injury. In each instance, Mrs. Eagleston expressed fear of harm, and in some instances she reported threats by her husband. Prior to the stabbing on December 27, 1986, the only reported knifing took place on November 9, 1986, when Mrs. Eagleston stabbed her husband in the leg with a paring knife; and the only arrests were made on November 23, 1986, when both Mr. Eagleston and Mrs. Eagleston were arrested following an incident in which Mr. Eagleston claimed his wife had violated his order of protection while Mrs. Eagleston claimed her husband had beaten her. Both Eaglestons subsequently withdrew the charges against each other arising out the November 23 fracas.

On December 27, 1986, following an argument in which Mr. Eagleston charged his wife with infidelity, Mr. Eagleston stabbed her 30 or 33 times with a carving knife.

Mrs. Eagleston filed suit on December 7, 1989 against the County; the Suffolk County Police Department (hereinafter sometimes referenced collectively with the County as the "County"); Police Commissioner Daniel Guido; the former commissioner, Dewitt C. Treder; and ten police officers. Judge Wexler dismissed the claims against two policemen in a ruling that has not been appealed. Plaintiff voluntarily dismissed her claims against another policeman and against Commissioner Guido. On April 22, 1992, Judge Wexler granted partial summary judgment dismissing Mrs. Eagleston's claims against

---

**2.** Although the Eaglestons had been living as husband and wife for eight years, their actual marital status was dubious. At trial, Mrs. Eagle- ston testified that she had never actually been divorced from her first husband. We refer to the Eaglestons as husband and wife for convenience.

defendant police officers Bugge, Kopf, Kern and Donnelly on statute of limitations grounds, and those against police officer Ozer on the ground of qualified immunity, 790 F.Supp. 416.

In May 1992, the case proceeded to its first jury trial against the County, the former police commissioner and the two remaining policemen. At the close of plaintiff's case, Judge Wexler dismissed the claims against police officers Pesale and Milward on the ground of qualified immunity. The claims against the County and its former police commissioner, Dewitt Treder, were submitted to the jury, which deadlocked after three days of deliberations. Judge Wexler declared a mistrial.

The second jury trial commenced August 11, 1993, Judge Tsoucalas presiding, solely on the issue of the liability of the County and its former police commissioner. After four days of deliberation, the eight-member panel was able to reach a unanimous verdict on only two issues: first, that the plaintiff failed to prove "by a preponderance of the evidence that Suffolk County and/or [Police] Commissioner Treder had an unconstitutional policy which denied *women* equal protection of the law"; and second, that the plaintiff did establish "by a preponderance of the evidence that Suffolk County and/or [Police] Commissioner Treder had an unconstitutional policy which denied *victims of domestic violence* equal protection of the law." (Emphasis added.) The jury was unable to reach a unanimous verdict on whether this "unconstitutional policy" was the proximate cause of Mrs. Eagleston's stabbing injuries.

After excusing the jury and declaring a mistrial, Judge Tsoucalas granted defendants' motion for a directed verdict, and dismissed the remainder of the case, explaining his reasoning as follows:

> [T]here is no evidence that this Court heard that there was a policy of Suffolk County or the Police Commissioner that deprived the plaintiff of her constitutional rights. It hasn't been proven at all.
>
> There was testimony showing that some police officers didn't do their job and were negligent in their job and in performing their duties, but that doesn't mean that

there was a policy for all police officers to do something, and most of the police officers acted in accordance with the law and in accordance with the Constitution … and didn't deprive Mrs. Eagleston of her constitutional rights at all.

> There is nothing in the facts that I have heard that showed any policy on behalf of Suffolk County or any policy on behalf of the Commissioner.
>
> The fact that the Commissioner didn't know what was going on shows that he wasn't a good commissioner, that he may have been an incompetent commissioner, … but it doesn't mean that he had a policy of discriminating against women or discriminating against victims of domestic violence.
>
> There was no testimony whatsoever to show that there was discrimination in domestic violence cases
>
> . . . .

In his written order, dated August 25, 1993, Judge Tsoucalas stated simply that he had dismissed the matter because the plaintiff had failed to establish that either the County of Suffolk or Police Commissioner Treder "had a policy of denying women or victims of domestic violence equal protection of the law."

Final judgement was entered on November 10, 1993.

## DISCUSSION

Mrs. Eagleston raises numerous claims of error, none of which requires a third trial in this case.

### A. *Statute of Limitations*

█ Plaintiff sued individually the policemen who had responded to her calls for help. Judge Wexler dismissed her claims against four of these officers on statute of limitations grounds. We review *de novo* the grant of summary judgment and all evidence and all inferences to be drawn from the evidence must be viewed in the light most favorable to Mrs. Eagleston. *Prunier v. City of Watertown,* 936 F.2d 677, 679 (2d Cir.1991).

■ For § 1983 actions arising in New York, the statute of limitations is three years. *Owens v. Okure*, 488 U.S. 235, 250–51, 109 S.Ct. 573, 582, 102 L.Ed.2d 594 (1989). Mrs. Eagleston filed suit against the defendants on December 5, 1989, within three years of the December 27, 1986 stabbing but more than three years after the dates on which Officers Bugge, Kopf, Kern and Donnelly acted. Officer Bugge reported to the Eagleston home on October 20, 1986, the day Mr. Eagleston learned of the divorce proceeding. Officer Kopf interviewed Mrs. Eagleston on November 7, 1986 at the police station. Officer Kern responded to a call from Mrs. Eagleston on November 9, 1986, and arrived at the Eagleston home to discover that Mrs. Eagleston had stabbed her husband. Officer Donnelly reported to the Eagleston home on November 20, 1986 to find the Eaglestons arguing over the deed to their house.

Plaintiff argues that, for statute of limitations purposes, the repeated failure of the several police officers to arrest Mr. Eagleston constitutes one continuous two-month wrong which culminated in the December 27 attack.

■ While state law supplies the statute of limitations for claims under § 1983, federal law determines when a federal claim accrues. *See Cullen v. Margiotta*, 811 F.2d 698, 725 (2d Cir.), *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987). The claim accrues when the plaintiff "knows or has reason to know" of the harm. *Id.* Plaintiff claims that she did not know, or have reason to know, of the harm done to her until the knife attack of December 27. However, "the proper focus is on the time of the *discriminatory act*, not the point at which the *consequences* of the act becomes painful." *Chardon v. Fernandez*, 454 U.S. 6, 8, 102 S.Ct. 28, 29, 70 L.Ed.2d 6 (1981). This Court previously considered this issue in *Singleton v. City of New York*, 632 F.2d 185 (2d Cir.1980), *cert. denied*, 450 U.S. 920, 101 S.Ct. 1368, 67 L.Ed.2d 347 (1981). The plaintiff in *Singleton* alleged the existence of a conspiracy to violate his civil rights, and contended that the separate acts of the defendants—each of which would have supported a claim for compensatory damages when the act was done—

should be viewed as one transaction for the purpose of determining when the statute of limitations began to run. We disagreed:

> The crucial time for accrual purposes is when the plaintiff becomes aware that he is suffering from a wrong for which damages may be recovered in a civil action. To permit him to wait and toll the running of the statute simply by asserting that a series of separate wrongs were committed pursuant to a conspiracy would be to enable him to defeat the purpose of the time-bar, which is to preclude the resuscitation of stale claims.

*Id.* at 192.

In this case, the wrong alleged was the failure of the four policemen to afford Mrs. Eagleston equal protection of the law when she needed assistance. The district court held that any claim against Bugge, Kopf, Kern and Donnelly accrued on the date that each allegedly failed to protect Mrs. Eagleston, and that the three year period had run at the time Mrs. Eagleston filed her complaint on December 5, 1989.

■ Plaintiff contends that the District Court should have allowed a jury to determine when she "had knowledge of both the injury and its connection with the acts of the defendant" and thus when the statute of limitations would have begun to accrue. While she is correct that, in some circumstances, factual issues related to statute of limitations should be put before a jury, *see, e.g., Santiago Hodge v. Parke Davis & Co.*, 909 F.2d 628, 633 (1st Cir.1990), the statute of limitations issue in this case does not present disputed facts.

■ Plaintiff argues that her claims for police inaction on prior occasions did not accrue until the December 27 episode in which she suffered the physical injury for which she seeks damages. The district court held that each officer's allegedly improper failure to act was "sufficient to enable plaintiff to realize that she had suffered a compensable injury at that time." Accepting as true that the police culpably failed to arrest plaintiff's husband, time after time, that wrong was done repeatedly, in her presence and to her knowledge. Under *Singleton*, however,

the claim does not accrue until "the plaintiff becomes aware that [s]he is suffering from a wrong for which damages may be recovered in a civil action." *Singleton*, 632 F.2d at 192. The district court therefore should have considered specifically as to each defendant at what point Mrs. Eagleston had a compensable claim for the officer's alleged inaction.

■ It may be that the district court considered that, as to · each failure to act, a proven violation would support at least an award of nominal damages, even if she suffered no physical injury or property loss. *See Gibeau v. Nellis*, 18 F.3d 107, 110 (2d Cir.1994). To affirm on that basis, we would have to hold that nominal damages may be deemed compensable within the meaning of *Singleton*. It is unnecessary for us to reach that question, however, under the facts presented on this appeal. The four episodes involving officers Bugge, Kopf, Kern and Donnelly all pre-dated November 23, on which date Mrs. Eagleston testified she was beaten. Therefore, by November 23, she had suffered compensable damages in respect of any claim she may have had against those four policemen. Since the complaint in this action was filed more than three years after November 23, 1986, the statute of limitations had expired in respect of the claims against these four defendants. We therefore affirm the district court's order dismissing the complaint against them.

### B. *Qualified Immunity*

The district court held that officers' Ozer, Pesale and Milward enjoy qualified immunity, and dismissed the claims against them. We affirm because we agree that it was objectively reasonable for these three officers to believe that they lacked probable cause to arrest Mr. Eagleston.

■ The claims against Officer Ozer were dismissed on a motion for summary judgment and those against Officers Pesale and Milward were dismissed following presentation of plaintiff's case in the first trial. We review the dismissal of these claims *de novo*. *See Prunier v. City of Watertown*, 936 F.2d 677, 679 (2d Cir.1991) (review of summary judgment is *de novo*); *Sir Speedy, Inc. v. L & P Graphics, Inc.*, 957 F.2d 1033, 1039 (2d Cir.1992) ("The same framework [used by the district court] governs appellate review of the granting of a motion for a directed verdict ...").

■ Police officers may be held personally liable for damages under 42 U.S.C. § 1983 when, acting under color of state law, they deprive a person of "any rights, privileges, or immunities secured by the Constitution." However, qualified immunity functions as a judicially-created restraint to the threat of civil punishment. *See Magnotti v. Kuntz*, 918 F.2d 364, 365 (2d Cir.1990). "Th[is] defense affords not only protection from liability, but, in addition, freedom from suit." *Id.* at 365 (2d Cir.1990). Qualified immunity affords government actors broad protection from personal liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (citations omitted). We consider the particular circumstances that bear upon the immunity of each defendant.

■ 1. *Officer Ozer.* On December 7, 1986, Mrs. Eagleston telephoned the police because she believed she heard her husband in the Eagleston's basement apartment, which was at the time rented to Mr. Eagleston's sister. Jack Ozer responded to the call. After speaking briefly with Mrs. Eagleston, Ozer went to the basement apartment. Returning upstairs, he informed Mrs. Eagleston that, according to her sister-in-law, Mr. Eagleston was not on the premises. Lacking a search warrant, Ozer said he was unable to enter the apartment without the tenant's permission.

Mrs. Eagleston showed Ozer the November 26, 1986 order of protection granting her

"exclusive use and occupancy of the marital residence." Mr. Eagleston then appeared on the front lawn, claiming that he too lived in the basement apartment and paid rent for it. Under these facts, it is difficult to imagine the crime for which Ozer might have arrested Mr. Eagleston. It was objectively reasonable for Ozer to end his search of the basement upon being denied access by Mr. Eagleston's sister. Furthermore, it was objectively reasonable for Ozer to conclude that the term "marital residence" as used in the order of protection did not include an apartment rented to a third party. When the rights of an aggrieved party are not clearly established, there can be no § 1983 liability. See Hawkins v. Steingut, 829 F.2d 317, 319–21 (2d Cir.1987) (when federal law on an issue was far from "clearly established," individuals acting under color of state law could not be held liable under § 1983). It is at least debatable whether or not the protective order embraced a basement apartment occupied by a tenant. Therefore, Ozer's decision not to arrest Mr. Eagleston on December 7, 1986 was objectively reasonable. We affirm the finding of qualified immunity.

■ 2. *Officer Pesale.* After hearing testimony at the first trial, Judge Wexler concluded that Michael Pesale "did everything he was supposed to have done." Mrs. Eagleston alleged that, on December 8, 1986, Mr. Eagleston attempted to run her down with his car and threatened to beat her up. Pesale responded to the call. He interviewed Mrs. Eagleston at the Eagleston home, and she told him that Mr. Eagleston was not in the house. Pesale filled out a field report charging reckless endangerment and referred Mrs. Eagleston to the Crime Control Unit. He also drove around the neighborhood in an attempt to locate Mr. Eagleston and his car.

Pesale's actions were objectively reasonable under the circumstances, particularly since Mr. Eagleston could not be arrested immediately because he was not there. The district court properly recognized Pesale's qualified immunity.

■ 3. *Officer Milward.* M.P. Milward responded to a complaint by Mrs. Eagleston on December 24, 1986. She told him that an unseen person had thrown a rock through one of her windows and that she believed it was her husband. She also told Milward that she believed her husband was in the basement apartment. Officer Milward did little to locate Mr. Eagleston. However, even if he had found him, it is doubtful that he could have arrested him, absent some admission or further investigation. Mrs. Eagleston could not identify who threw the rock through her window. It was "objectively reasonable" for Milward to conclude that the order of protection had not been violated. The decision concluding that Milward acted under qualified immunity was proper.

C. *Evidentiary Rulings*

Mrs. Eagleston claims that Judge Tsoucalas erred in the course of the second trial by (a) refusing to admit the deposition testimony of Police Commissioner Daniel Guido, (b) refusing to hear the testimony of her expert witness while admitting the testimony of the County's expert, and (c) refusing to admit into evidence the County's 1991 Progress Report on domestic violence. We review a district court's evidentiary rulings for abuse of discretion. *United States v. Jamil,* 707 F.2d 638, 642 (2d Cir.1983).

1. *Commissioner Guido's Deposition.* Mrs. Eagleston wanted to demonstrate that a non-arrest policy or practice existed during the administration of former Police Commissioner Treder. She claims that the deposition testimony of the County's police commissioner includes a statement that a non-arrest policy in domestic violence incidents would amount to an equal protection violation, and that this statement constitutes an admission by the County that its pre-existing policy violated the Equal Protection Clause of the Fourteenth Amendment, presumably a party admission under Federal Rule of Evidence 801(d)(2).

■ According to the County, Police Commissioner Guido testified that he knew nothing about the arrest policy under former Police Commissioner Treder, but offered his view that a non-arrest policy in domestic violence cases would violate equal protection rights. Guido's legal insights concerning a

policy that may or may not have prevailed before he became Police Commissioner do not amount to a party admission under Federal Rule of Evidence 801(d)(2). In any event, his views on that subject would be inadmissible because they are legal conclusions concerning an ultimate issue in the case. *See United States v. Scop*, 846 F.2d 135, 139–40 (2d Cir.1988). Judge Tsoucalas acted within his discretion in sustaining the County's objection to Commissioner Guido's testimony.

■ 2. *Plaintiff's Expert Witness.* Judge Tsoucalas refused to qualify Mrs. Eagleston's expert, Dr. William Bengston, holding that Bengston was "far from being an expert" on the material in question. In reviewing this decision, we are mindful that "[t]he broad discretion of the trial court to determine the qualifications of witnesses will not be disturbed unless its ruling was manifestly erroneous." *McCullock v. H.B. Fuller Co.*, 981 F.2d 656, 657 (2d Cir.1992) (citation and internal quotations omitted).

According to Mrs. Eagleston, Bengston would have testified that "while defendant Treder was police commissioner, Suffolk County had a practice of mediation rather than arrest in cases of domestic violence, and that to change the policy from mediation to arrest as Treder was ordered to do by the County Legislature, Treder should have taken certain actions including training and strong supervision." Bengston holds a doctorate in sociology, a credential that does not in itself describe any specific body of scientific or technical expertise pertinent to this case. The district court found that the plaintiff failed to establish that Bengston was an expert in either criminology or domestic violence. Furthermore, Bengston had no familiarity with New York procedure in general or the practices of the Suffolk County Police Department in particular. Judge Tsoucalas acted within the bounds of his discretion in concluding that someone unfamiliar with arrest practices in New York was unqualified to testify about them.

■ 3. *The Progress Report.* In 1988, the County changed its arrest policy for situations involving domestic violence. Previously, mediation played a significant role in Suffolk County's resolution of domestic disputes. Under the new policy, police officers were directed to arrest anyone who violates an order of protection. Police officers were also directed to arrest whenever the officer had reasonable cause to believe an individual committed a misdemeanor in a domestic dispute, unless the victim prefers that no arrest be made; and, where a felony may have been committed, police officers were directed to effect an arrest regardless of what the victim may prefer or say. Suffolk County Executive Order 1a–1988. In 1991, the Office of the County Executive published a study entitled "Progress Report: A Comprehensive Anti–Domestic Violence Program for Suffolk County," documenting the police department's arrest record in the years following the 1988 change in the domestic violence arrest policy. Other statistical evidence, admitted and summarized at trial, furnishes data on arrests for domestic violence in the period 1985–1987. Although the data for 1986—the year Mrs. Eagleston was stabbed—is not in all respects comparable to the data in the Progress Report, the data can be contrasted, making certain allowances, and a jury easily could conclude from that comparison that arrests in domestic violence incidents rose fivefold between 1986 and 1991.

Defendants moved to exclude the Progress Report on the ground that it is evidence of a subsequent remedial measure within the meaning of Federal Rule of Evidence 407. Judge Tsoucalas excluded the document from evidence, apparently on the ground that it was immaterial: "I am sustaining the objection. It [the Progress Report] has nothing to do with this case. It has nothing to do with this case as to whether or not they had a policy, what the police officers do and what the police officers did." We consider both the materiality of the Progress Report as well as the Rule 407 argument.

Plaintiff's claim was that the County was engaged in an unconstitutional policy or practice in regard to its treatment of domestic violence. The district court decided that "what the police officers do ... and did" does not bear upon what the *policy* may have been. Certainly, however, "what police offi-

cers do ... and did" is material to the issue of what the *practice* may have been. The Progress Report documents a sharp increase in domestic violence arrests after 1987, and explicitly states that the County acted to "implement a pro-arrest policy in incidents of family violence and abuse." Standing alone, the Progress Report does not evidence that the County was sluggish in its prosecution of domestic violence incidents during the time Mrs. Eagleston claims the police ignored her pleas for help; the change in the arrest rate could reflect the reluctance of victims to ask that their spouses be arrested or prosecuted, a choice given less deference after 1988. Nevertheless, the Progress Report was material to the issues presented.

■ At trial, the County argued that the Progress Report should be excluded as a subsequent remedial measure under Federal Rule of Evidence 407. According to the County, admission of the Progress Report would offend public policy because the increased arrest rate should be deemed a "subsequent measure" taken by the county in an effort to remedy a defective policy or practice.

Other courts have concluded that Rule 407 does apply to policy changes in civil rights cases. *See Maddox v. City of Los Angeles,* 792 F.2d 1408, 1417 (9th Cir.1986); *Specht v. Jensen,* 863 F.2d 700, 701 (10th Cir.1988); *Luera v. Snyder,* 599 F.Supp. 1459, 1463 (D.Colo.1984). For several reasons, however, we decline to determine whether it was within the district court's discretion to exclude this document under Rule 407. Appellants have not briefed the issue, and neither party has attempted to explore the public policy values that are implicated on both sides of this issue. Moreover, because the district court based its decision on materiality, it never considered the Federal Rule 407 issue.

Since we conclude that the district court erred in excluding this document on the only ground stated by the court, we proceed on the assumption that the progress report should have been admitted. However, as discussed below, we conclude that Judge Tsoucalas would have been correct to direct a verdict in favor of the County even if the Progress Report had been admitted into evidence.

### D. *Directed Verdict*

■ Following his dismissal of the deadlocked jury in the second trial, Judge Tsoucalas directed a verdict in favor of Suffolk County and former Police Commissioner Treder because he found that plaintiff had "failed to present any evidence that the defendants ... had a policy of denying women or victims of domestic violence equal protection of the law." The district court did not separately address Mrs. Eagleston's allegation that there was such a practice irrespective of the policy. Judgment as a matter of law should be granted when:

> (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it].

*Bauer v. Raymark Indus., Inc.,* 849 F.2d 790, 792 (2d Cir.1988). An appellate court reviewing the district court's decision to grant a motion for a directed verdict makes the same inquiry. *Sir Speedy, Inc. v. L & P Graphics, Inc.,* 957 F.2d 1033, 1039 (2d Cir. 1992). We affirm the directed verdict in favor of the County and the former Police Commissioner, because, (a) on the basis of the admitted evidence, the jury could not have concluded without conjecture that the County's practice deviated from its stated arrest policy of treating domestic violence the same as other acts of violence; and (b) even if the "Progress Report" is deemed to show that the County's practice deviated from its stated policy, that deviation is insufficient to create a jury issue in the absence of a showing that its purpose was invidious discrimination against women.

■ Section 1983 provides an instrument by which an individual deprived of a federal right by a person acting under color of state law may be compensated. *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1912–13, 68 L.Ed.2d 420 (1981). "It is well established

that in order to state a claim under § 1983, a plaintiff must allege (1) that the challenged conduct was attributable at least in part to a person acting under color of state law, and (2) that such conduct deprived the plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States." *Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir.1993). The defendants do not dispute that the police department was acting under color of state law when it responded to Mrs. Eagleston's complaints. Thus, the only issue contested in this dispute is whether the department's actions violated the Constitution.

█ The threshold requirement of an equal protection claim is a showing that the government discriminated among groups. Yet the evidence admitted at trial does no more than invite speculation as to whether or not the County had a special arrest policy or practice in cases of domestic disputes. In its defense, Suffolk County argued that the police department's stated policy was that domestic violence incidents were to receive the same police attention as other incidents, and that its practice was no different. At trial, Mrs. Eagleston undertook to show that the practice of the police department deviated from the stated policy. The district court admitted the following evidence on that question, none of which is sufficient to raise a question for the jury:

—*The testimony of Mrs. Eagleston.* Mrs. Eagleston described her encounters with Suffolk County police in the period from October through December 1986. Accepting Mrs. Eagleston's account as true, her testimony showed at most (as Judge Tsoucalas found) that a few police officers failed to perform their jobs well. Her testimony does not evidence a department-wide practice of disparate treatment for domestic disputes. Even on the level of anecdote, Mrs. Eagleston's account is fully consistent with a responsive police department dealing on an incident-by-incident basis with an ambiguous series of events. The police responded repeatedly. The husband had access to his sister's apartment in the basement of his wife's house, a complication that (the police reasonably understood) allowed him to enter the house without invading the marital prem-

ises. After a while, each spouse had an order of protection against the other. The police did make arrests, taking both spouses into custody on November 23. On other occasions, the police were asked to arrest Mr. Eagleston after a rock was thrown by a person Mrs. Eagleston did not see, and were summoned to deal with threats that had not resulted in violence.

—*1984 Suffolk County Legislature's Resolution.* In a clearly non-discriminatory 1984 resolution, Suffolk County directed former Police Commissioner Treder to "press criminal enforcement in cases of family violence" and to make arrests if either an order of protection was violated or there was evidence of a criminal offense by one member of a family against another. The 1984 resolution did not specify a course of action to be taken if the victim of domestic violence did not wish an arrest to be made. This resolution was not a new law, but simply a policy statement that reiterated existing state law.

—*The Former Police Commissioner's Orders to the Police.* In response to the 1984 resolution, the former Police Commissioner issued a Special Order instructing officers that "anytime a Police Officer handles a domestic dispute and there is evidence of a family offense which is either a felony or a misdemeanor being committed by one member of a family against another, a civilian or summary arrest will be made." Former commissioner Treder issued a further Order in 1985 directing that, "[i]f probable cause exists that the respondent violated the terms of the Order of Protection, an arrest will be made." These orders were clearly non-discriminatory.

—*Legislative Minutes.* Prior to adoption of the 1984 resolution, it was debated at an October 1984 meeting of the Public Safety Committee of the County Legislature. The minutes of the meeting, admitted despite defendants' objection that they were inadmissible hearsay, contain observations that some police officers did not enforce the policy regarding criminal domestic violence. They also reflect that the former Police Commissioner was "for the resolution 100%," albeit with one particular caveat: the former Police Commissioner was concerned that the resolu-

tion, with its focus on "*criminal* enforcement in cases of family violence," was eliminating the option of family court—an option available under New York state law for domestic disputes involving disorderly conduct, harassment, menacing, reckless endangerment and less serious instances of assault. At trial, the County's attorney referenced "a provision requir[ing] police officers in these incidents to advise the victim of their option to go to family court [in addition to] criminal court." This is doubtless a reference to § 812 of the Family Court Act, which gives a complainant a choice of alternate forums. N.Y. Family Court Act § 812 (McKinney 1983). As the Practice Commentary to § 812 indicates, the family court judge has the discretion to transfer the case to criminal court, notwithstanding the complainant's election, if it is clear that criminal sanctions would be appropriate.

—*Raw data on domestic disputes.* At trial, Officers William Murphy and Joseph Kistinger described the data they helped compile on domestic disputes between 1984 and 1987. An examination of the data shows that arrests were made in about 2% of these cases. The County represented at oral argument—and Mrs. Eagleston's counsel did not dispute—that this data included complaints of harassment as well as complaints of assault and violent crimes. The exhibit does not reflect how many of these cases *could* have resulted in an arrest, but the County's lawyer suggests that in many of these instances there would have been no probable cause to arrest. Mrs. Eagleston's personal experience, as recounted in her testimony, reinforces this conclusion. In the absence of more detailed analysis of the circumstances involved in the recorded incidents, this material is next to useless.

—*Police testimony regarding mediation.* Two police officers testified about their training in mediation techniques. Assuming that such training could support an inference of invidious discrimination in any circumstances, the training given by Suffolk County encompassed mediation for all disputes, not solely for domestic disputes.

The disputed 1991 Progress Report, excluded from evidence by Judge Tsoucalas, would be (if admissible) the only evidence on which plaintiff could begin to build a showing of discriminatory treatment. Although statistical evidence alone is not always enough to establish the existence of a policy or custom, *see McCleskey v. Kemp,* 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), the document does include statistics showing a sharp increase in arrests for domestic violence after the 1988 change in policy.

Mrs. Eagleston sought the opportunity at trial to use these later statistics, showing many more arrests, as evidence that the earlier statistics reflect a practice of ignoring domestic assaults. However, nothing in the record supports an assumption that the later statistics reflect a more appropriate level of arrests, or achieve some parity with arrests that do not involve domestic violence. Nor is there any basis for assuming that any variation in the level of arrests was caused by an earlier discriminatory policy rather than by a tendency for victims of domestic violence to forgo pressing charges or to elect proceedings in Family Court. On appeal, as in the district court, the County attributes the higher level of arrests to a new policy of making an arrest whenever an order of protection is violated, regardless of the victim's expressed preference.

In presenting its defense, the County argued that its practice was the same as its policy, and that there was no difference between the way its officers treated incidents of domestic violence and the way its officers treated other incidents of violence. The County did not attempt to justify the existence of a discrepancy because it argued there was none. Mrs. Eagleston argues that the Progress Report, viewed in light of the other evidence, shows a sharp change in the arrest rate for domestic violence; and that the County's denial of any discrepancy, and its resulting failure to justify any discrepancy, would have allowed the jury to conclude, as it did, "that Suffolk County and/or Commissioner Treder had an unconstitutional policy which denied victims of domestic violence equal protection of the law."

■ Even were we to accept Mrs. Eagleston's interpretation of the Progress Report and of the evidence actually introduced at

878

trial, she establishes no more than that on average a claim of domestic violence is less likely to result in an arrest than a claim of violence between strangers. But a plaintiff alleging sex discrimination who seeks to predicate a *prima facie* equal protection claim on a policy that is not facially discriminatory must establish that the intent or purpose of the policy was to discriminate against one sex. *Personnel Adm'r of Massachusetts v. Feeney,* 442 U.S. 256, 274, 99 S.Ct. 2282, 2293–94, 60 L.Ed.2d 870 (1979). The presentation of evidence that the purportedly neutral policy "has a disparate impact upon a group that has historically been the victim of discrimination" can be an "important starting point" in establishing the existence of a Constitutional violation. *Id.* at 273–74, 99 S.Ct. at 2293–94. However, viewed in the light most favorable to Mrs. Eagleston, her evidence (including the Progress Report) does not carry her beyond this starting point. "[T]he Fourteenth Amendment guarantees equal laws, not equal results," and "purposeful discrimination is the condition that offends the Constitution." *Id.* (citations and internal quotations omitted). Discriminatory purpose "implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* at 279, 99 S.Ct. at 2296. Mrs. Eagleston has not met her burden of proof on this issue. A directed verdict is appropriate in a domestic violence equal protection claim unless the plaintiff adduces evidence sufficient to sustain the inference that there is a policy or a practice of affording less protection to victims of domestic violence than to other victims of violence in comparable circumstances, that discrimination against one sex was a motivating factor, and that the policy or practice was the proximate cause of plaintiff's injury. *See Ricketts v. City of Columbia, Mo.,* 36 F.3d 775, 779 (8th Cir. 1994); *Hynson v. City of Chester, Legal Dep't,* 864 F.2d 1026, 1031 (3d Cir.1988).

■ Nothing in the Constitution requires that arrest policies be uniformly applied in all situations. "Because of the inherent differences between domestic disputes and non-domestic disputes, legitimately different factors may affect a police officer's decision to arrest or not to arrest in any given situation." *Ricketts,* 36 F.3d at 781. A community may decide that mediation makes more sense, or is more promising, in disputes between members of the same family, or between neighbors, than in disputes between strangers, or that Family Court or counselling is a useful alternative to the criminal courts in certain situations. These considerations may impact arrest statistics without violating the equal protection clause.

■ The statistics presented by Mrs. Eagleston may or may not establish that victims of domestic violence are treated differently; but no evidence offered at trial tends to show that any such distinction resulted from an impermissible discriminatory intent. Absent some evidence of such an intent or purpose, there is no equal protection claim. *See Feeney,* 442 U.S. at 274, 99 S.Ct. at 2293–94.

An inference of discriminatory intent cannot be supported simply by some discrepancy between the arrest policy adopted by the County (disclaiming any different treatment for perpetrators of domestic violence) and the actual implementation of that policy by the police. Governments often announce and threaten policies of strict enforcement (and reserve the power to implement such policies) while affording the police measured discretion. *See* Meir Dan–Cohen, *Decision Rules and Conduct Rules: On Acoustic Separation in Criminal Law,* 97 Harv.L.Rev. 625 (1984) (describing two sets of legal rules: conduct rules, which are addressed to the general public and designed to influence behavior; and decision rules, which are directed to the officials who apply conduct rules and which may differ from the publicly announced rules). It may be sound policy to threaten ruthless enforcement even if the community does not always follow through with the promised harshness. Certainly the Constitution allows state actors the flexibility to implement such a discretionary policy.

E. *Other Arguments*

We have carefully considered appellant's other challenges to the district court's rulings and find that these challenges are either

without merit or mooted by our disposition of the appeal.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.