52 F.3d 1139
 Peter J. PINAUD, Plaintiff-Appellant,
v.
COUNTY OF SUFFOLK, James Catterson, Patrick Henry, David
Freundlich, John Holownia, Kevin Fitzgerald,
Patrick J. O'Connell, and Mark Cohen,
Defendants-Appellees.
 No. 572, Docket 94-7416.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 21, 1994.
Decided April 6, 1995.
 
 Jared J. Scharf, White Plains, NY, for plaintiff-appellant.
 Snitow & Pauley, New York City, for defendants-appellees Catterson, Henry, Holownia, Fitzgerald, O'Connell, and Cohen.
 Perini & Hoerger, Hauppauge, NY, for defendant-appellee David R. Freundlich.
 Robert J. Cimino, Suffolk County Atty., Hauppauge, NY (Robert H. Cabble on the brief), for defendant-appellee County of Suffolk.
 Before: OAKES, JACOBS, and CALABRESI, Circuit Judges.
 Judge JACOBS concurs in part and dissents in part in a separate opinion.
 CALABRESI, Circuit Judge:
 
 
 1
 Peter J. Pinaud's odyssey through the criminal justice system cannot be a source of pride to us or to that system. He served a 28-month sentence on a state conviction that was subsequently vacated, and for which the charge was eventually dismissed. And though he was led to believe when he pleaded guilty to this state charge that a contemporaneous federal sentence would be reduced by 828 days that he ultimately served on the vacated state conviction, Pinaud was in fact denied any federal credit for that time.
 
 
 2
 Attributing his hardships to others' ill will and not to bad luck, Pinaud filed this lawsuit claiming that his travails were the result of an "out-of-court" plot among a group of district attorneys for the County of Suffolk. Pinaud's amended complaint alleged that these prosecutors conspired to deny him his civil rights and to imprison him unlawfully. Accordingly, he sought damages from the district attorneys and the County of Suffolk based on 42 U.S.C. Sec. 1983 and on New York state law.
 
 
 3
 The United States District Court for the Eastern District of New York (Leonard D. Wexler, Judge) dismissed Pinaud's action, and he has appealed. Judge Wexler ruled that absolute prosecutorial immunity shielded the individual district attorney defendants--James Catterson, Patrick Henry, David Freundlich, John Holownia, Kevin Fitzgerald, Patrick J. O'Connell, and Mark Cohen--as to all but one claim, which Pinaud later withdrew. The District Court also found that many of Pinaud's other claims were barred by the statute of limitations, and that he had failed to state a claim for malicious prosecution--a cause of action that had survived the other rulings.
 
 
 4
 Though we believe that Pinaud's misfortunes are lamentable, we conclude that almost all of Pinaud's causes of action cannot be maintained and were properly dismissed. We do find that one of his allegations might form the basis of a viable claim under Sec. 1983. Consequently, we affirm in part, reverse in part, and remand for further proceedings.
 
 BACKGROUND
 
 5
 Pinaud's troubles with the law began in 1982, when a federal investigation indicated that Pinaud had committed certain federal tax crimes. Strangely, he was not indicted on charges stemming from this federal investigation until February 1985.
 
 
 6
 In the meantime, a warrantless search by the Suffolk County police found stolen cars and parts in a salvage yard adjoining an autobody shop where Pinaud worked. As a result of this state investigation, Pinaud was indicted in August 1983 on state stolen property charges and on other related offenses.
 
 
 7
 Before his trial on these state charges, Pinaud moved to suppress the evidence seized from the salvage yard, and a contemporary decision by a New York appellate court in a separate case apparently made suppression likely. Pinaud claims that concerns over the possible exclusion of key evidence led the Suffolk County District Attorney's Office to ask Pinaud to plead guilty to only one count of possession of stolen property. At first, Pinaud says, he refused to accept such a plea agreement.
 
 
 8
 Shortly after, on May 3, 1984, defendants O'Connell, Freundlich, and Henry asked for an increase in Pinaud's bail from $10,000 to $250,000. Pinaud claims that the defendants had long known the facts on the basis of which they sought this increase, and only raised these facts on May 3rd in order to coerce a guilty plea from Pinaud. The bail application was granted, and because Pinaud could not meet the higher bail, he was immediately jailed.
 
 
 9
 After spending four days in jail, Pinaud agreed to plead guilty in state court to one count of possessing stolen property. According to Pinaud, his plea agreement included promises from the prosecution to recommend a limited sentence. The sentence was to be made concurrent with his anticipated federal sentence and was to be served in a federal corrections facility. To facilitate this, the prosecution agreed to a delay in Pinaud's sentencing; this would permit Pinaud to work out the federal tax charges against him and enable the state court to impose a state sentence concurrent to Pinaud's expected federal sentence. The state court was informed of these aspects of the plea agreement and accepted Pinaud's guilty plea.
 
 
 10
 The record reveals that the state court scheduled sentencing for some six weeks later, on June 15, 1984, and explained that at that time it planned only to obtain a probation report and to adjourn the proceedings until November 1984. The court further stated that Pinaud did not need to appear in court on June 15, 1984; Pinaud's bail was reduced so he could be free pending sentencing.
 
 
 11
 Pinaud asserts that, in order to violate the terms of this plea agreement, the defendants soon after manufactured a "bogus" bail jumping charge. Though the court had said that Pinaud need not be in court on June 15, 1984, when Pinaud failed to appear at that time the court directed his attorney to tell him to appear on July 16, 1984. Pinaud failed to appear in court either on July 16 or on the adjourned dates of July 17 and 18. A bench warrant was issued, and Pinaud's bail was forfeited. He was ultimately arrested on the warrant on October 16, 1984. Defendants then informed a grand jury that Pinaud had failed to appear in court as required, and an indictment charging one count of bail jumping was handed down. The prosecutors did not tell the grand jury of the state court's initial statement that Pinaud did not need to appear on June 15, 1984.
 
 
 12
 When he was captured, on October 16, 1984, Pinaud was immediately brought into state court for sentencing on the stolen property charge. The court indicated that, because of his bail jumping, Pinaud had forfeited his right to the benefits agreed to by the state in his plea agreement. Pinaud then expressed reservations about his initial guilty plea on the stolen property charge, and suggested that he had not entered it voluntarily. As a result, the state court vacated his plea.
 
 
 13
 The next day, Pinaud told the court that he was willing to reinstate his initial guilty plea and to proceed immediately to sentencing on the stolen property charge, if this would lead to the dismissal of the other state charges pending against him. Defendant O'Connell consented to this arrangement, and the state court again accepted Pinaud's guilty plea to one stolen property charge. The state court imposed a sentence of two-and-one-third to seven years' imprisonment on the stolen property charge, dismissed the bail jumping indictment, and remanded Pinaud immediately to state prison.
 
 
 14
 In late 1984 and early 1985, while serving his state sentence, Pinaud was finally indicted, separately, in the Northern and Eastern Districts of New York on a series of federal tax charges. Pinaud pleaded guilty to two counts in the Northern District and was sentenced to 44 months' imprisonment, consecutive to his state sentence. Later, Pinaud pleaded guilty to two counts in the Eastern District and was sentenced to three years' additional imprisonment, consecutive to both his state sentence and the Northern District sentence.[1]
 
 
 15
 In March of 1986, Pinaud moved in state court to vacate his state conviction on the ground that the terms of his plea agreement had been violated. Though his motion was initially denied, Pinaud was ultimately successful, and the state Appellate Division vacated his conviction in July 1987. See People v. Pinaud, 132 A.D.2d 580, 517 N.Y.S.2d 560 (2d Dep't), leave to appeal denied, 70 N.Y.2d 802, 522 N.Y.S.2d 120, 516 N.E.2d 1233 (1987). Unfortunately for Pinaud, by the time this happened, he had finished serving the full 28-month sentence on the state charge and had been transferred to federal custody to serve his federal sentences.
 
 
 16
 Pinaud claims that he believed that he was to receive federal credit for time he had served on the vacated state conviction, and in fact the U.S. Bureau of Prisons initially awarded Pinaud credit for 828 of the 848 days he had spent in prison on that charge. The Bureau of Prisons subsequently rescinded this award, however, and said that it had erred when it had found that Pinaud was to get this credit. According to Pinaud, this change was due, in part at least, to defendant Cohen's deceptive representations to the Bureau of Prisons concerning the likelihood that Pinaud's conviction and sentence would be reinstated.[2]
 
 
 17
 In February 1988, while Pinaud was still serving his federal sentence, defendant O'Connell decided to reprosecute the state stolen property and bail jumping charges, which had been remitted to the state trial court after Pinaud's initial conviction had been vacated. According to Pinaud, it was not necessary for him to appear personally in state court in connection with these state charges. Nevertheless, defendants Henry and Holownia allegedly reassigned Pinaud's case within the Suffolk County District Attorney's Office until they found an assistant district attorney, defendant Fitzgerald, who was willing to arrange for Pinaud's transfer back into state custody. This transfer--which apparently was from a relatively comfortable federal facility to the much harsher Suffolk County Jail--took place in August of 1988, and Pinaud claims that its sole purpose was to coerce another guilty plea from him.
 
 
 18
 To this end, defendants Henry and Holownia also allegedly harassed Pinaud through "Bullpen Therapy," a practice that involves transporting prisoners back and forth needlessly from the county jail to the county courthouse when their cases are not on the court calendar. Pinaud asserts that he was subjected to this treatment--which forced him to endure long bus trips chained to other prisoners and to spend entire days in the county courthouse's damp and overcrowded holding cell--many times throughout September and October of 1988.
 
 
 19
 Nevertheless, Pinaud did not plead guilty, and on October 19, 1988, the state trial court granted Pinaud's motions to dismiss the stolen property and bail jumping charges. The court noted that the prosecutors had not informed the grand jury about the court's statement that Pinaud did not need to be in court on June 15, 1984, and that this had kept the grand jury from considering Pinaud's possible belief that the statement meant that he did not need to come to court until November 1984. Highlighting that a district attorney is expected, in the interests of justice, to present exculpatory evidence that might reasonably be expected to lead the grand jury not to indict, the state court dismissed the bail jumping charge. As to the stolen property charge, the court noted that prosecutors could not now fulfill Pinaud's initial plea agreement and that Pinaud had in any event already served ample time in jail. For these reasons, the state court concluded that justice would best be served by dismissing the stolen property charge.
 
 
 20
 Though this dismissal concluded all state criminal charges against Pinaud, he was held in Suffolk County Jail for an additional three weeks before being transferred back to federal custody. Pinaud's amended complaint suggests that the defendants were involved in keeping him in state custody after the charges were dismissed and intentionally delayed his return to federal custody simply to harass him further.
 
 
 21
 Based on this series of events, Pinaud started this action against the individual district attorneys and the County of Suffolk on June 17, 1991. Pinaud's complaint claimed that, from August 1983 to October 1988, the defendants engaged in an "out-of-court" conspiracy to imprison him unlawfully and to violate his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments. This complaint asserted causes of action based on 42 U.S.C. Sec. 1983 and also related state claims for false arrest, intentional infliction of emotional distress, prima facie tort, and fraud.
 
 
 22
 In a thorough opinion, reported at Pinaud v. County of Suffolk, 798 F.Supp. 913 (E.D.N.Y.1992), the District Court ruled on the defendants' motions to dismiss and to grant summary judgment. Reviewing the alleged improper actions by the individual defendants, the District Court concluded that absolute prosecutorial immunity shielded these defendants from suit for all their acts except for their alleged responsibility for "Bullpen Therapy," the supposedly unnecessary trips from the county jail to the county courthouse. See 798 F.Supp. at 918-20. The Court further found that Pinaud's allegations of an "out-of-court" conspiracy did not overcome the defense of absolute immunity. See id. at 921. The District Court went on to find that the applicable three-year statute of limitations barred Pinaud from maintaining any federal claims, including those against the County of Suffolk, which derived from the defendants' acts that occurred before June 17, 1988, and also that only those state claims that were based on prima facie tort and on fraud were not time-barred. See id. at 921-23. After finding that Pinaud's Sec. 1983 claim against the County grounded on malicious prosecution was timely, the Court determined that Pinaud had, nevertheless, failed to state a claim for malicious prosecution. See id. at 923-24.
 
 
 23
 Pinaud moved under Rule 54(b) of the Federal Rules of Civil Procedure to have the District Court's order certified as a final judgment, which would have permitted an immediate appeal. The District Court denied his motion. Pinaud then made an extremely significant stipulation: in order to allow the entry of a final judgment, he agreed to amend his complaint to withdraw all claims not already dismissed by the District Court, even though some of them had prima facie validity. Accordingly, the District Court entered a final judgment in favor of the defendants, and this appeal followed.
 
 DISCUSSION
 
 24
 Pinaud undoubtably has received shoddy treatment, and, given the sequence of events, it is not surprising that he blames the County of Suffolk and its district attorneys for his hardships. Moreover, the harms Pinaud allegedly suffered, if they were in fact the product of defendants' malicious and wanton acts, could well have provided the foundation for a number of viable federal or state causes of action. Indeed, this very possibility is borne out by the fact that the District Court's ruling did not dismiss all of Pinaud's claims; the Court explicitly found that some of the claims in Pinaud's initial amended complaint survived the defendants' motions for dismissal and for summary judgment.
 
 
 25
 Yet, Pinaud by stipulation withdrew all claims that were still viable after the District Court's ruling, and this decision shapes most of the issues on appeal. His decision means that we do not have before us all those among Pinaud's many claims that survived summary judgment, and we are asked, in a context that alleges multiple manifest wrongs, to consider only those claims that the District Court concluded could not be maintained. In fact, largely as a consequence of Pinaud's stipulation and of how he has fashioned and presented those claims that he did not withdraw, we are bound to hold that most of the causes of action that Pinaud presents to us on appeal are barred.
 
 
 26
 I. Federal Claims against District Attorney Defendants[3]
 
 
 27
 As an initial matter, we note that Pinaud's complaint does not clearly state, nor did the District Court's opinion explicitly consider, whether the district attorneys are being sued in their official capacities or in their individual/personal capacities. Nevertheless, since the District Court analyzed Pinaud's suit against the prosecutors in terms of absolute immunity and since the "personal privilege[s] of absolute or qualified immunity ... are available to governmental officials only with respect to damage claims asserted against them in their individual capacities," Ying Jing Gan v. City of New York, 996 F.2d 522, 529 (2d Cir.1993), it is clear the Court assumed that Pinaud's claims were brought against the prosecutors in their individual capacities. See generally Kentucky v. Graham, 473 U.S. 159, 165-67, 105 S.Ct. 3099, 3104-06, 87 L.Ed.2d 114 (1985) (explaining differences between personal capacity and official capacity suits); Shabazz v. Coughlin, 852 F.2d 697, 699-700 (2d Cir.1988) (same).
 
 
 28
 Though Pinaud assails the District Court's conclusion that most of the specific alleged acts of the district attorneys are covered by absolute immunity, he does not argue or even suggest that the District Court erred in assuming that his claims were brought against the prosecutors in their individual capacities. Moreover, Pinaud's "request for punitive and compensatory damages, coupled with the defendants' summary judgment motion on [absolute] immunity ... grounds, suggests that the parties believed that this action is a personal capacity suit" as to the district attorney defendants. Shabazz, 852 F.2d at 700. It follows that the claims against the district attorneys are appropriately evaluated in terms of the "personal privilege" provided by the doctrine of absolute prosecutorial immunity.
 
 A. The Doctrine of Prosecutorial Immunity
 
 29
 Though the text of 42 U.S.C. Sec. 1983 does not mention official immunities, the Supreme Court has ruled that "Congress did not intend Sec. 1983 to abrogate immunities 'well grounded in history and reason.' " Buckley v. Fitzsimmons, --- U.S. ----, ---- - ----, 113 S.Ct. 2606, 2612-13, 125 L.Ed.2d 209 (1993) (quoting Tenney v. Brandhove, 341 U.S. 367, 376, 71 S.Ct. 783, 788, 95 L.Ed. 1019 (1951)). As first outlined by the Supreme Court in Imbler v. Pachtman, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), among the traditional official immunities that perdure is the absolute immunity for state prosecutors. The doctrine of absolute prosecutorial immunity creates a formidable obstacle for a plaintiff seeking to maintain a civil rights action against a district attorney, as it provides that "prosecutors are absolutely immune from liability under Sec. 1983 for their conduct in 'initiating a prosecution and in presenting the State's case,' insofar as that conduct is 'intimately associated with the judicial phase of the criminal process.' " Burns v. Reed, 500 U.S. 478, 486, 111 S.Ct. 1934, 1939, 114 L.Ed.2d 547 (1991) (quoting Imbler, 424 U.S. at 430-31, 96 S.Ct. at 995).
 
 
 30
 Especially in cases, such as the present one, in which a plaintiff plausibly alleges disgraceful behavior by district attorneys, the application of this doctrine is more than disquieting. Absolute immunity "leave[s] the genuinely wronged ... without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty." Imbler, 424 U.S. at 427, 96 S.Ct. at 993. Nevertheless, the doctrine is well-established and has been held to be needed "to preserve the integrity of the judicial process" and to enable "zealous[ ] perform[ance of] prosecutorial duties ... [without] the constant threat of legal reprisals." Hill v. City of New York, 45 F.3d 653, 656 (2d Cir.1995); see also Gregoire v. Biddle, 177 F.2d 579, 581 (2d Cir.1949) (L. Hand, J.), cert. denied, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950).
 
 
 31
 Still, absolute prosecutorial immunity does not necessarily thwart Pinaud's claims simply because he names individual district attorneys as defendants. Absolute immunity depends on "the nature of the function performed, not [on] the identity of the actor who performed it." Forrester v. White, 484 U.S. 219, 229, 108 S.Ct. 538, 545, 98 L.Ed.2d 555 (1988); see also Ying Jing Gan, 996 F.2d at 530. "When a prosecutor is engaged in administrative or investigative activities, he is entitled only to qualified immunity," and thus the individual district attorney defendants in this action are to be held "absolutely immune from liability under section 1983 [only] for acts 'within the scope of [their] duties in initiating and pursuing a criminal prosecution.' " Day v. Morgenthau, 909 F.2d 75, 77 (2d Cir.1990) (quoting Imbler, 424 U.S. at 410, 96 S.Ct. at 985); see also Powers v. Coe, 728 F.2d 97, 103 (2d Cir.1984) (describing the nature of this "functional approach to the immunity question").
 
 
 32
 In its ruling below, the District Court enumerated the alleged illegal acts by the district attorneys and correctly applied this "functional approach" to determine whether the individual defendants were entitled to absolute immunity for their activities.[4] And, as noted before, the Court concluded that the district attorneys "are covered by absolute immunity for all their alleged acts that plaintiff claims caused him injury except as to the allegation that defendants Henry and Holownia arranged to have plaintiff frequently transported" from the county jail to the county courthouse (the "Bullpen Therapy" claim that Pinaud has withdrawn). Pinaud, 798 F.Supp. at 921.
 
 
 33
 B. Pinaud's Allegation of an "Out-of-Court Conspiracy"
 
 
 34
 On appeal, Pinaud claims that the District Court misunderstood the nature of his claims when it found that the individual defendants were shielded by absolute prosecutorial immunity. Pinaud asserts that his claims against the district attorneys were not based so much on any particular act, but rather on the alleged "out-of-court" plot among the defendants to violate his civil rights and to imprison him unlawfully. Recognizing that absolute immunity will generally cover a prosecutor for all actions taken in court, Pinaud tries to get around absolute immunity by alleging a conspiracy that was organized outside the courtroom, and he suggests that the individual--perhaps immune--acts of the prosecutors were offered by him in evidence only to substantiate this "out-of-court" conspiracy.
 
 
 35
 Yet, try as he might, Pinaud's attempt to avoid the defense of absolute prosecutorial immunity by fashioning his claim in terms of a conspiracy based only on actions taken outside the courtroom does not avail. The Supreme Court recently explained in Buckley v. Fitzsimmons, --- U.S. ----, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993), that any claim that absolute immunity is to be confined to conduct occurring in the courtroom was "plainly foreclosed by ... Imbler." Id. at ----, 113 S.Ct. at 2615. Rather, as Imbler first explained and Buckley underscored, absolute immunity extends to those acts, whether in or out of the courtroom, "which occur in the course of the [prosecutor's] role as an advocate for the State." Buckley, --- U.S. at ----, 113 S.Ct. at 2615; see Imbler, 424 U.S. at 431 n. 33, 96 S.Ct. at 996 n. 33 (noting that prosecutorial duties involve "actions apart from the courtroom"); see also Dory v. Ryan, 25 F.3d 81, 83 (2d Cir.1994) ("The application of immunity is not limited to the duties a prosecutor performs in the courtroom.").
 
 
 36
 Moreover, though it may initially seem peculiar to hold that even a conspiracy among prosecutors is shielded by absolute immunity, the "fact that such a conspiracy is certainly not something that is properly within the role of a prosecutor is immaterial, because '[t]he immunity attaches to his function, not to the manner in which he performed it.' " Dory, 25 F.3d at 83 (quoting Barrett v. United States, 798 F.2d 565, 573 (2d Cir.1986)). As this Court and others circuits have repeatedly held, since absolute immunity covers "virtually all acts, regardless of motivation, associated with [the prosecutor's] function as an advocate," id., when the underlying activity at issue is covered by absolute immunity, the "plaintiff derives no benefit from alleging a conspiracy." Hill, 45 F.3d at 659 n. 2. Accord Snelling v. Westhoff, 972 F.2d 199, 200 (8th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 977, 122 L.Ed.2d 132 (1993); Ashelman v. Pope, 793 F.2d 1072, 1077-79 (9th Cir.1986) ("Allegations of conspiracy between judge and prosecutor ... are insufficient to overcome [their] immunities."); see also Dorman v. Higgins, 821 F.2d 133, 139 (2d Cir.1987) ("[S]ince absolute immunity spares the official any scrutiny of his motives, an allegation that an act was done pursuant to a conspiracy has no greater effect than an allegation that it was done in bad faith or with malice, neither of which defeats a claim of absolute immunity."); Cok v. Cosentino, 876 F.2d 1, 3 (1st Cir.1989); Holloway v. Walker, 765 F.2d 517, 522-23 (5th Cir.), cert. denied, 474 U.S. 1037, 106 S.Ct. 605, 88 L.Ed.2d 583 (1985).[5]
 
 
 37
 In the end, then, Pinaud's formulation of his claims in terms of an "out-of-court conspiracy" does nothing to undercut the District Court's conclusions concerning absolute immunity.
 
 
 38
 C. Distinct Acts of District Attorney Defendants
 
 
 39
 Somewhat surprisingly, Pinaud relies almost exclusively on conspiracy notions in seeking to defeat the individual defendants' immunity. He makes no effort, but for one or two purely conclusory statements, to dispute the District Court's determinations that--except for the "Bullpen Therapy" claim, which Pinaud has stipulated away--all of the defendants' distinct acts are properly regarded as "prosecutorial" rather than as "investigative" or "administrative." In any event, after reviewing the relevant case law, we conclude that all but one of the distinct acts Pinaud complains about in this appeal are "intimately associated with the judicial phase of the criminal process," Imbler, 424 U.S. at 430, 96 S.Ct. at 995, so that absolute prosecutorial immunity applies to them.
 
 
 40
 There are, roughly, seven acts by the defendants that Pinaud alleges wrongly harmed him: (1) improperly seeking to increase Pinaud's bail; (2) making false representations to prompt a plea agreement and then breaching that agreement; (3) manufacturing a bail jumping charge through misrepresentations to the grand jury; (4) making misrepresentations to the U.S. Bureau of Prisons; (5) needlessly transferring Pinaud from federal to state custody; (6) unnecessarily transporting Pinaud from the county jail to the county courthouse; and (7) wrongfully delaying Pinaud's transfer back into federal custody. In addition to these specific acts, Pinaud also makes a claim sounding in malicious prosecution against the individual defendants.
 
 
 41
 Case law from this circuit clearly establishes that the district attorneys' activities with respect to the malicious prosecution claim, as well as all the claims relating to Pinaud's plea agreement and the presentations to the grand jury, are covered by absolute immunity. See, e.g., Hill, 45 F.3d at 661 (prosecutors immune from claims based on malicious prosecution or based on their conduct before a grand jury); Ying Jing Gan, 996 F.2d at 530 (absolute immunity in connection with decision whether to commence a prosecution); Powers, 728 F.2d at 103-04 (plea bargaining covered by prosecutorial immunity); Taylor v. Kavanagh, 640 F.2d 450, 453-54 (2d Cir.1981) (plea negotiations protected by absolute immunity).
 
 
 42
 Similarly, though we have never previously had occasion explicitly to rule on the question, we cannot disagree with the holding of other circuits that actions in connection with a bail application are best understood as components of the initiation and presentation of a prosecution, and therefore are protected by absolute immunity. See Lerwill v. Joslin, 712 F.2d 435, 438 (10th Cir.1983); Burns v. County of King, 883 F.2d 819, 823-24 (9th Cir.1989); see also Myers v. Morris, 810 F.2d 1437, 1446 (8th Cir.) (explaining that "advocating a particular level of bail" is covered by absolute immunity), cert. denied, 484 U.S. 828, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987). And since we have previously said that conduct in a "sentencing proceeding" would be protected by absolute prosecutorial immunity, see Taylor, 640 F.2d at 451-52, and also that actors preparing and presenting presentence reports should receive absolute immunity, see Dorman, 821 F.2d at 138-39, we are bound to hold that a prosecutor's communications with other officials directly pertaining to matters of sentencing are entitled to absolute immunity. See Allen v. Thompson, 815 F.2d 1433, 1434 (11th Cir.1987) (allegedly malicious letter written by prosecutor to Bureau of Prisons and Parole Commission covered by absolute immunity); see also Johnson v. Kegans, 870 F.2d 992, 997-98 (5th Cir.) (prosecutor's statements to parole board protected by absolute immunity), cert. denied, 492 U.S. 921, 109 S.Ct. 3250, 106 L.Ed.2d 596 (1989). Cf. Lucien v. Preiner, 967 F.2d 1166, 1167-68 (7th Cir.) (holding that absolute immunity covers prosecutor's statements in clemency proceeding), cert. denied, --- U.S. ----, 113 S.Ct. 267, 121 L.Ed.2d 196 (1992).
 
 
 43
 Pinaud's transfer from federal to state custody, instead, presents a close issue as to the applicable degree of immunity.[6] As a general matter, coordinating the transfer of a prisoner from one corrections facility to another in the same penal system is an administrative task for which only qualified immunity would be available. But the action of a prosecutor in ordering the transfer of a prisoner from federal into state custody to facilitate a state prosecution is another matter. It is often, as here, an integral component of initiating a prosecution, since without the presence of the prisoner in state custody, a trial cannot begin and the entire prosecution could be halted. See Ehrlich v. Giuliani, 910 F.2d 1220, 1223 (4th Cir.1990) ("One of the most important duties of a prosecutor pursuing a criminal proceeding is to ensure that defendants ... are present at trial."). Since it concerns the mechanisms for securing a prisoner's availability for prosecution, the ordering by a prosecutor of a prisoner's transfer from federal to state custody in order to begin a trial entails the performance of functions similar to those involved in arguing for bail or in obtaining an arrest warrant, and these actions are covered by absolute immunity, see Barr v. Abrams, 810 F.2d 358, 362 (2d Cir.1987) (concluding that prosecutors were "immune from suit based on their actions in ... procuring [plaintiff's] arrest warrant"); Lerwill, 712 F.2d at 437-38.[7]
 
 
 44
 The reason for these holdings applies directly to transfers between federal and state systems to begin prosecution. If prosecutors are concerned with possible liability when they take the steps necessary to make a defendant available for prosecution, the decision whether or not to prosecute may be directly affected. And that is precisely the type of concern that absolute immunity seeks to foreclose. See Powers, 728 F.2d at 103-04. It is thus hard to avoid the conclusion that absolute prosecutorial immunity applies to the decision to arrange for the transfer of a prisoner from federal to state custody when that transfer enables the state prosecution of that prisoner.
 
 
 45
 The fact that Pinaud claims that his transfer into state custody was unnecessary and done simply to coerce a guilty plea from him does not alter, and really has no bearing on, this immunity analysis. It only underlines the disconcerting nature of the doctrine of absolute prosecutorial immunity. Since, as detailed before, the extent of immunity always depends upon the nature of the activity in question, and not upon how wrongly the particular actors may have performed that activity in a specific instance, see, e.g., Dory, 25 F.3d at 83, Pinaud's assertions, though disturbing, do not help him.
 
 
 46
 Pinaud also alleges that defendants Henry and Holownia subjected him to "Bullpen Therapy"--that is, that they arranged for his needless and repeated transport from the county jail to the county courthouse--and that these acts are not covered by prosecutorial immunity. He is, in this respect, quite right. And, in fact, the defendants apparently never claimed absolute immunity for any acts relating to this allegation. Moreover, the District Court explicitly ruled that such actions were not covered by prosecutorial immunity, and this ruling has not been appealed by the defendants. Unfortunately for Pinaud, though, this claim, since it was among those that were not dismissed by the District Court's opinion, was one of the claims withdrawn by him in his final amendment to his complaint. For that reason, and that reason alone, it does not survive.
 
 
 47
 There is, however, one allegation by Pinaud that the District Court did not consider in detail, but apparently did dismiss (so that it has not been withdrawn by Pinaud's stipulation), which we find may ground a viable claim. Pinaud asserts that the individual district attorney defendants were involved in keeping him in state custody for three weeks after the dismissal of all state charges against him. The District Court seems to have been addressing this allegation when it indicated that the district attorney defendants were immune from suit under Sec. 1983 for Pinaud's alleged injuries because they "emanate from the duration and conditions of his imprisonment and therefore arise directly from his prosecution." Pinaud, 798 F.Supp. at 921. We read the District Court's holding as dismissing Pinaud's claim stemming from his allegedly unnecessary continued detention in state custody, and hold that such a dismissal was incorrect.[8]
 
 
 48
 Keeping a person in state custody after the termination of all charges against him has nothing to do with conducting a prosecution for the state. Since the handling of a prisoner after the complete conclusion of all criminal charges is not a prosecutorial task but rather an administrative one, the district attorney defendants are entitled only to the protection of qualified immunity for any involvement in Pinaud's seemingly delayed transfer back into federal custody after the final dismissal of the state charges against him. See Allen v. Lowder, 875 F.2d 82, 85-86 (4th Cir.1989) (holding that prosecutor's conduct to continue plaintiff's incarceration after his conviction was reversed involved "acting in a purely administrative capacity ... and is, therefore, not entitled to absolute immunity"). Consequently, Pinaud should be permitted to go forward with a claim premised on this alleged behavior by the prosecutors[9]--a claim, incidently, that is clearly not barred by the statute of limitations.[10]
 
 
 49
 D. Final Resolution of Claims against Individual Defendants
 
 
 50
 In sum, we affirm the District Court holding that most of Pinaud's claims against the district attorney defendants are precluded by the defense of absolute prosecutorial immunity.[11] Only one claim that is before us against the district attorney defendants survives, and that relates to Pinaud's allegations that the prosecutors were involved in delaying his transfer into federal custody for three weeks after the dismissal of all state charges against him. We remand this component of Pinaud's claims for further proceedings.
 
 
 51
 II. Federal Claims against the County of Suffolk[12]
 
 
 52
 We must now address the claims asserted by Pinaud against the County of Suffolk, the only other named party in this dispute. Figuring out exactly which claims against the County of Suffolk are before us on appeal is no easy task, however, given Pinaud's amendment of his complaint to withdraw all claims not dismissed by the District Court's decision, and the failure of the parties to focus upon and distinguish different claims on appeal.
 
 
 53
 We begin by reviewing the District Court's holding. First, the District Court ruled that Pinaud was barred by the three-year statute of limitations from maintaining claims against the County grounded in actions which occurred prior to June 17, 1988, and was not time-barred from asserting claims based on actions after that date. See Pinaud, 798 F.Supp. at 921-23, 925. Second, the District Court ruled that, though Pinaud's malicious prosecution claim against the County was timely, his allegations, nevertheless, failed to state a cause of action under Sec. 1983. See id. at 923-24. Since Pinaud withdrew from his complaint all actions not dismissed by the District Court's opinion, our task is limited to considering whether Pinaud can state a claim against the County of Suffolk for malicious prosecution and whether he can maintain any claims against the County based on actions which occurred before June 17, 1988. That is, we review only the claims that the District Court dismissed.[13]
 
 A. Malicious Prosecution
 
 54
 Since "municipalities do not enjoy immunity from suit--either absolute or qualified--under Sec. 1983," Pinaud's malicious prosecution claim against the County of Suffolk is not barred by prosecutorial immunity. Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, --- U.S. ----, ----, 113 S.Ct. 1160, 1162, 122 L.Ed.2d 517 (1993); see also Ferran v. Town of Nassau, 11 F.3d 21, 23 (2d Cir.1993), cert. denied, --- U.S. ----, 115 S.Ct. 572, 130 L.Ed.2d 489 (1994). Nevertheless, his claim raises intricate legal questions, some of which are not addressed by the parties and all of which create serious obstacles for a successful Sec. 1983 cause of action. First, an allegation of deficiencies in the "management of the [district attorney's] office," Walker v. City of New York, 974 F.2d 293, 301 (2d Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1387, 122 L.Ed.2d 762 (1993), would appear to be necessary under our precedents in order for any claim of malicious prosecution against the County of Suffolk to stand.[14] It is highly doubtful that Pinaud has sufficiently made any such allegation. Second, even if we read Pinaud's complaint liberally so as to include allegations sufficient to ground municipal liability, the Supreme Court's splintered decision in Albright v. Oliver, --- U.S. ----, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), which sought to limit the constitutional pegs upon which a Sec. 1983 malicious prosecution claim might hang, and our own pre-Albright holdings, make the status and validity of Sec. 1983 malicious prosecution claims, such as this one, uncertain to say the least.
 
 
 55
 Tempted as we are to try to clarify the law in this area in the wake of the many questions left unanswered by the Supreme Court's fragmented ruling in Albright, we nonetheless conclude that this is not the case in which to struggle with the meaning of Albright. The District Court found that Pinaud had not stated a claim under our pre-Albright malicious prosecution decisions. And the parties have not discussed Albright at all and therefore seem to assume that our pre-Albright decisions are controlling in this case. Under these circumstances, given that no claim has been made that any of the pre-Albright requirements for a malicious prosecution claim that are involved here have been eliminated by Albright, we think it is appropriate to await another case--one in which the parties have addressed the impact of Albright and in which the issue is necessarily determinative--to explore that case's effect on Sec. 1983 malicious prosecution claims.[15]
 
 
 56
 Relying upon our pre-Albright precedents--which held that a plaintiff seeking to maintain a malicious prosecution action "pursuant to Sec. 1983 must establish termination of the prosecution in his favor in accordance with applicable state law," Hygh v. Jacobs, 961 F.2d 359, 367 (2d Cir.1992)--the District Court ruled that Pinaud failed to state a claim because the dismissal of the charges against him "was not indicative of his innocence and therefore was not a favorable termination" under New York law.
 
 
 57
 As to the dismissal of the stolen property charge against Pinaud, the District Court's decision is clearly on solid ground. The state court dismissed the stolen property indictment "in the interest of justice" pursuant to N.Y.Crim.Proc.Law Sec. 210.40. The New York Court of Appeals has held that a dismissal in the interests of justice "leaves the question of guilt or innocence unanswered." Ryan v. New York Telephone Co., 62 N.Y.2d 494, 504-05, 478 N.Y.S.2d 823, 829, 467 N.E.2d 487 (1984). And we have read Ryan to mean that "as a matter of law, [such a dismissal] cannot provide the favorable termination required as the basis for a claim of malicious prosecution." Hygh, 961 F.2d at 367.
 
 
 58
 Pinaud makes a nuanced argument that New York law does not preclude the possibility that a dismissal in the interests of justice could constitute a favorable termination. His argument finds some support in the recent decision by the First Department of New York's Appellate Division in Hankins v. The Great Atlantic & Pacific Tea Co., 208 A.D.2d 111, 622 N.Y.S.2d 678 (1st Dep't, 1995), which suggested that Ryan should not be read "to establish that, as a matter of law, a dismissal in the interest of justice bars a subsequent claim for malicious prosecution." Id. 622 N.Y.S.2d at 679. However, even if New York law permits a dismissal in the "interest of justice" to constitute a favorable termination in certain instances, Pinaud's suggestion that the circumstances surrounding the state court's dismissal of the stolen property charge against him might be indicative of his innocence is not supported by the facts in this case. He had twice pleaded guilty to this charge. And, when it ordered dismissal, the state court stressed the fact that Pinaud had already served a full 28-month sentence on this charge. Under the circumstances, it is clear that Pinaud cannot demonstrate that the dismissal of the stolen property charge was "on the merits and in [his] favor," id. at 681, and so Pinaud cannot, as a matter of law, satisfy the favorable termination requirement of a malicious prosecution claim as to this charge. See Miller v. Star, 123 A.D.2d 750, 750-52, 507 N.Y.S.2d 223, 224 (2d Dep't 1986) (holding, "as a matter of law," on similar facts that dismissal in the interests of justice could not "constitute a resolution favorable to the accused"); see also Hankins, 622 N.Y.S.2d at 680-81 (justifying the holding in Miller by explaining that in that case the original dismissal "was more in the nature of a procedurally-induced gift to the defendant than a determination based on the merits"). Thus, we conclude that the District Court was ultimately correct when it found that Pinaud had failed to state a malicious prosecution claim based on the stolen property charge.
 
 
 59
 The bail jumping charge is more difficult. The District Court asserted that this charge was also dismissed in the interests of justice. But a review of the state court's memorandum of dismissal reveals that the nature of its ruling on the bail jumping charge is actually quite difficult to characterize. In dismissing the charge, the state court stressed the district attorney's failure to present potentially exculpatory evidence to the grand jury. And the court intimated that the grand jury might well have failed to indict had it been presented with this evidence. We have not found nor have the parties pointed to any decision of a New York court which gives guidance on whether a ruling of this sort should be characterized as a favorable termination or not. Under these circumstances, it would not be out of the question to deem the dismissal one "such that innocence is indicated," Ward v. Silverberg, 206 A.D.2d 522, 614 N.Y.S.2d 757, 759 (2d Dep't 1994), and to hold that it constitutes a favorable termination.
 
 
 60
 In the end, though, we can resolve this case without deciding whether New York would deem the state court's dismissal of the bail jumping charge to be a favorable termination. For, as a matter of law, we find that Pinaud failed to satisfy one of the other requirements for a pre-Albright Sec. 1983 malicious prosecution claim. Besides having to demonstrate a favorable termination, a plaintiff must also establish a lack of probable cause for the commencement of the original prosecution that is alleged to have been malicious. See, e.g., Posr v. Doherty, 944 F.2d 91, 100 (2d Cir.1991); Colon v. City of New York, 60 N.Y.2d 78, 82, 468 N.Y.S.2d 453, 455, 455 N.E.2d 1248 (1983). Here, on the undisputed facts, Pinaud cannot establish a lack of probable cause for his prosecution on the bail jumping charge.
 
 
 61
 Despite the state trial court's initial statement to Pinaud that he need not appear in court on June 15, 1984, the state court on June 15 clearly told Pinaud's attorney that Pinaud was required to appear in court on July 16, 1984. Pinaud failed to appear in court on July 16, or within the next 30 days. These undisputed facts, without more, satisfy the requisites of New York's bail jumping statute. See N.Y. Penal Law Sec. 215.57; People v. Eiffel, 81 N.Y.2d 480, 484, 600 N.Y.S.2d 437, 439, 616 N.E.2d 1099 (1993). Bail jumping "is a strict liability statute in that no proof of any culpable mental state is required." People v. McMillian, 174 A.D.2d 759, 761, 571 N.Y.S.2d 782, 784 (2d Dep't 1991). This means that the elements of the offense are met regardless of the validity of Pinaud's claims that he believed that he did not have to appear until November 1984. See People v. Santangelo, 194 A.D.2d 924, 925, 599 N.Y.S.2d 191, 192 (3d Dep't) (explaining that "proof of a particular culpable mental state is not an element of bail jumping"), leave to appeal denied, 82 N.Y.2d 726, 602 N.Y.S.2d 823, 622 N.E.2d 324 (1993). And, since New York considers informing a defendant's attorney of a required appearance date sufficient to establish "constructive knowledge" of the date by the defendant, see, e.g., People v. White, 115 A.D.2d 313, 314, 496 N.Y.S.2d 187, 188 (4th Dep't 1985), it follows that Pinaud had no valid defense based on a lack of awareness of the July 16 required appearance date.
 
 
 62
 Since the undisputed facts under New York's law actually provide nearly conclusive evidence of Pinaud's guilt on the bail jumping charge, it is clear that, as a matter of law, there existed probable cause to initiate a bail jumping prosecution against Pinaud in October of 1988. Consequently, though we do so on different grounds from the District Court, we agree that Pinaud failed to state a Sec. 1983 claim based on malicious prosecution.
 
 B. Statute of Limitations
 
 63
 The applicable statute of limitations for Sec. 1983 actions arising in New York requires claims to be brought within three years. See Owens v. Okure, 488 U.S. 235, 250-51, 109 S.Ct. 573, 582, 102 L.Ed.2d 594 (1989); Eagleston v. Guido, 41 F.3d 865, 871 (2d Cir.1994). Pinaud filed his action on June 17, 1991, and this led the District Court to adopt the date of June 17, 1988 as the dividing line between those acts upon which Pinaud could base a timely claim against the County and those acts upon which he could not. Pinaud does not dispute that three years is the correct statute of limitations period. His argument on appeal is rather that there are reasons why, in this instance, a claim based on acts before June 17, 1988 should still be considered timely.
 
 
 64
 Specifically, Pinaud appears to make a couple of closely-related, though ultimately distinct, arguments that claims based on acts before June 17, 1988 should not be barred by the three-year statute of limitations. Pinaud argues that because all the acts about which he complains were part of an out-of-court plot from August 1983 through November 1988--of which he did not become aware until the fall of 1988, and which the defendants sought to conceal--his claims based on acts prior to June 17, 1988 are not time-barred. In essence, Pinaud contends that (1) his claims based on acts prior to June 1988 did not accrue until after June 1988 because he did not know of the wrongful conspiracy before that time, and (2) even if his claims in some sense accrued earlier, the statute of limitations was equitably tolled by virtue of the individual defendants' fraudulent concealment of their actions for which the County is responsible.
 
 
 65
 Pinaud's arguments are unavailing. Even assuming that Pinaud's claims involve more than "conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive [him] of his constitutional rights" of the sort that we generally reject outright, Dwares v. City of New York, 985 F.2d 94, 100 (2d Cir.1993),[16] the argument that his assertion of a conspiracy should serve to delay the time when his causes of action accrue is foreclosed by this Court's decision in Singleton v. City of New York, 632 F.2d 185 (2d Cir.1980), cert. denied, 450 U.S. 920, 101 S.Ct. 1368, 67 L.Ed.2d 347 (1981).
 
 
 66
 Singleton involved a set of Sec. 1983 claims, analogous to those lodged by Pinaud in this action, against two police officers and New York City. As here, some of the acts alleged by the plaintiff occurred prior to the statute of limitations cut-off date, others occurred after, and the plaintiff sought to avoid any time-bar through an allegation of a conspiracy. See id. at 188-89, 192-93. After noting that federal law governs the date of accrual for a Sec. 1983 cause of action and that this date is determined by "when the plaintiff knows or has reason to know of the injury which is the basis of his action," id. at 191 (citation omitted), this Court in Singleton rejected the use of a conspiracy theory to circumvent the statute of limitations:
 
 
 67
 Characterizing defendants' separate wrongful acts as having been committed in furtherance of a conspiracy or as "a single series of interlocking events" does not postpone accrual of claims based on individual wrongful acts.... To permit [plaintiff] to wait and toll the running of the statute simply by asserting that a series of separate wrongs were committed pursuant to a conspiracy would be to enable him to defeat the purpose of the time-bar, which is to preclude the resuscitation of stale claims.... The existence of a conspiracy does not postpone the accrual of causes of action arising out of the conspirators' separate wrongs. It is the wrongful act, not the conspiracy, which is actionable, whether that act is labelled a tort or a violation of Sec. 1983.
 
 
 68
 Id. at 192. As the District Court properly concluded, this holding necessarily thwarts Pinaud's attempt to utilize conspiracy allegations to postpone the accrual of his claims based on acts occurring prior to June 1988. See also Eagleston, 41 F.3d at 871. In saying this, we emphasize that our holding in Singleton is not a Catch-22 holding: it does not require a plaintiff to bring a claim of which he or she neither knows nor ought to know. It simply says that when a plaintiff knows or ought to know of a wrong, the statute of limitations on that claim starts to run, and the later awareness that the actionable wrong was also part of a conspiracy does not expand the statutory time limit.
 
 
 69
 The fact that Pinaud's claims here are against the County of Suffolk gives his delayed accrual argument a little more bite. Since an actionable claim under Sec. 1983 against a county or municipality depends on a harm stemming from the municipality's "policy or custom," see Monell v. Department of Social Services, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978), a cause of action against the municipality does not necessarily accrue upon the occurrence of a harmful act, but only later when it is clear, or should be clear, that the harmful act is the consequence of a county "policy or custom." In fact, Singleton recognizes that sort of delayed accrual theory: "Where no single act is sufficiently decisive to enable a person to realize that he has suffered a compensable injury, the cause of action may not accrue until the wrong becomes apparent." 632 F.2d at 192-93. Cf. Eagleston, 41 F.3d at 871-72 (discussing possible delay in accrual date based on when plaintiff is aware of a wrong for which damages may be recovered in a civil action).[17]
 
 
 70
 However, given the length of time between the acts Pinaud seeks to use as the basis for his claims and the time he filed his lawsuit, the application of a delayed accrual theory for his claims against the County of Suffolk does not avail him. Almost all of the acts before June 1988 upon which Pinaud seeks to base a claim--e.g., the allegedly wrongful increasing of his bail, the manufacturing of a "bogus" bail jumping charge, the claimed false representations in his plea agreement--occurred in 1984, more than four years before the date upon which a claim would be timely. Even if we accept Pinaud's assertion that he did not know about, and should not have known about, any County of Suffolk "policy or custom" at the time these acts occurred, he certainly knew about, or at least had reason to come to know about, the policy or custom, which he now alleges, well before June of 1988. Indeed, a telling submission by Pinaud's counsel in February of 1988--still four months before the crucial statute of limitations date--details all the acts before that time that Pinaud now claims provided him evidence of the County of Suffolk's "policy or custom" to produce the harms of which he complains.
 
 
 71
 Pinaud's claim for equitable tolling based on a notion of fraudulent concealment must also fail. This court recognizes an equitable tolling doctrine in the context of Sec. 1983 actions, and when a "defendant fraudulently conceals the wrong, the time [limit of the statute of limitations] does not begin running until the plaintiff discovers, or by the exercise of reasonable diligence should have discovered, the cause of action." Keating v. Carey, 706 F.2d 377, 382 (2d Cir.1983). To take advantage of this doctrine, however, a plaintiff must submit non-conclusory evidence of a conspiracy or other fraudulent wrong which precluded his possible discovery of the harms that he suffered. See, e.g., Dory v. Ryan, 999 F.2d 679, 681 (2d Cir.1993) (tolling statute of limitations until time when plaintiff received an affidavit from a witness at his trial detailing the existence of a conspiracy by state officials to present perjurious testimony against plaintiff), modified on other grounds, 25 F.3d 81 (2d Cir.1994).
 
 
 72
 Here, however, Pinaud has only submitted evidence that there was a conspiracy to harm him. He provides no direct or even indirect evidence to indicate that any of the defendants, and particularly the County of Suffolk, took tangible steps either alone or through a conspiracy to conceal the nature of their activities toward him. See Davis v. Grusemeyer, 996 F.2d 617, 624 n. 13 (3d Cir.1993) (indicating that fraudulent concealment claim was inadequately pleaded because plaintiff "failed to allege active concealment" by any defendant). Moreover, even if we were to conclude that Pinaud had sufficiently alleged a conspiracy that served fraudulently to conceal the County of Suffolk's wrongs against him, he has not indicated why "by the exercise of reasonable diligence" he was only able to "discover" the wrongs against him after June of 1988. Again, as his counsel's February 1988 submission shows, the majority of harmful acts that Pinaud complains about occurred before that time and he was clearly aware of these acts when, or not long after, they occurred. See id. at 624-25 & n. 13 (rejecting fraudulent concealment tolling claim when plaintiff's letter showed that he was on notice concerning certain acts).
 
 
 73
 In sum, then, we agree with the District Court's determination that Pinaud is barred by the applicable three-year statute of limitations from grounding any federal Sec. 1983 claims on acts occurring before June 17, 1988.[18] And, as we have indicated before, it is Pinaud himself who--wisely or not--has by stipulation withdrawn his claims based on those acts which occurred later.
 
 CONCLUSION
 
 74
 In the end, the perhaps disquieting result in this case, which seems to preclude examination of allegations which if true are scandalous, is due, first, to the fact that our rules concerning prosecutorial immunity apply to bar causes of action based even on gross misbehavior by prosecutors when they are performing their prosecutorial functions, and, second and most important, to the fact that for his own strategic reasons, Pinaud has withdrawn most of the claims which could survive summary judgment. Nevertheless, one of Pinaud's claims does survive, and if there is substance in it, he may well be able to get redress.
 
 
 75
 Accordingly, we affirm, with one exception, the District Court's order dismissing Pinaud's claims against the district attorneys and the County of Suffolk, and we remand for further proceedings Pinaud's Sec. 1983 claim based on his allegations that the district attorneys wrongly conspired to keep him in state custody for three weeks after the dismissal of all state charges against him.
 
 
 76
 JACOBS, Circuit Judge, concurring in part, dissenting in part:
 
 
 77
 I concur in the result except insofar as the majority opinion remands for further proceedings concerning the allegation that Pinaud's transfer from state prison to federal prison was delayed by approximately three weeks.
 
 
 78
 * In order to pursue an immediate appeal following the district court's summary judgment order dismissing less than all of Pinaud's claims, Pinaud voluntarily dismissed all of his remaining claims. Thus our jurisdiction depends upon the fact that the only claims preserved for appeal are those that the district court dismissed on defendants' motion for summary judgment. I think it is easily demonstrated that the transfer delay was not the subject of the district court's summary judgment order and was therefore withdrawn, if indeed it ever existed in the first place.
 
 
 79
 The introduction and fact recitation of the complaint alleges that Pinaud was transferred back to federal prison three weeks after his state criminal charges were dismissed. Am.Compl. pp 4, 75; Appendix at 3-4, 29. This event is referred to again only once, as one of the acts in furtherance of the conspiracy sought to be pleaded in Count Three. Am.Compl. p 91; Appendix at 35. Since I agree with the majority that the conspiracy claim was properly dismissed for a variety of reasons, I do not believe that the complaint states any claim in respect of the transfer delay. I am not alone. Up to now, no one involved in this case has perceived or acknowledged the existence of a non-conspiracy claim against the individual prosecutors premised upon the transfer delay.
 
 
 80
 In March 1992, the defendants filed a motion for summary judgment. The only grounds for dismissing the federal claims urged by the prosecutor defendants were statute of limitations and absolute immunity. The defendants' supporting brief on the immunity issue listed the following five acts as suitable for summary disposition:
 
 
 81
 (1) coerc[ion of] his guilty plea by applying to increase his bail from $10,000 to $250,000 on May 4, 1984 (Am.Compl. pp 24-27);
 
 
 82
 (2) knowingly present[ing] false information to a grand jury to obtain an indictment against him for bail jumping on October 16, 1984 (Am.Compl. p 36);
 
 
 83
 (3) breach [of] an alleged plea agreement on October 17, 1984, by permitting him to be sentenced to a longer term of imprisonment which was not concurrent with the anticipated federal sentences (Am.Compl. pp 38-39);
 
 
 84
 (4) ... the rescission of a credit against his term of federal imprisonment on September 11, 1987, by reporting to the U.S. Bureau of Prisons that the District Attorney was appealing an Order vacating the state sentence of imprisonment (Am.Compl. p 50); and
 
 
 85
 (5) ... [his] transfer ... from federal to state prison in 1988 [made in an effort] to coerce Pinaud to plead guilty in the continued state prosecution. (Am.Compl. pp 62-70).
 
 
 86
 Defendants' Brief in Support of Motion for Summary Judgment at 4 (footnote omitted); Record on Appeal Document No. 35.
 
 
 87
 In deciding that issue, the district court carefully set forth the acts and claims as to which it was granting summary judgment. Since I agree with the majority that the district court issued a "thorough opinion," ante at 1146, I assume that the district court did not lose any claims along the way. Before considering the immunity issue in respect of individual acts, the district court surveyed the allegations at issue:
 
 
 88
 Plaintiff alleges six distinct acts, taken by one or more of the district attorney defendants, which caused his injuries: (1) defendants improperly sought to increase plaintiff's bail; (2) defendants misled the Grand Jury to obtain an indictment against plaintiff for Bail Jumping; (3) defendants breached their plea agreement with plaintiff; (4) defendants misrepresented the status of plaintiff's state prosecution to the Bureau of Prisons; (5) defendants arranged to transfer plaintiff from Allenwood to the Riverhead Jail; and (6) defendants arranged to have plaintiff frequently transported by bus, in chains, from the Riverhead Jail to the Hauppauge Courthouse on days that his case was not on the court calendar. Defendants, however, contend that the first five of these alleged acts are covered by absolute immunity.
 
 
 89
 798 F.Supp. at 918 (emphasis added). This passage tells us which alleged prosecutorial abuses are addressed in the district court's opinion and which are not. They are the same five alleged acts as to which the defendants asserted absolute immunity in the brief they submitted to the district court. After enumerating six alleged acts, the district court takes note of the defendants' contention that the first five are covered by absolute immunity. The transfer delay addressed in the majority opinion is not among the five; it is not even among the six.
 
 
 90
 The majority characterizes the transfer delay as "one allegation by Pinaud that the district court did not consider in detail, but apparently did dismiss...." Ante at 1151 (emphasis added). It is surely an understatement to conclude that the district court did not consider the transfer delay "in detail". In order to locate such an allegation anywhere in the district court opinion, the majority relies upon one catchall phrase: "The District Court seems to have been addressing this allegation when it indicated that the district attorney defendants were immune from suit under Sec. 1983 for Pinaud's alleged injuries because they 'emanate from the duration and conditions of his imprisonment and therefore arise directly from his prosecution.' Pinaud, 798 F.Supp at 921." Ante at 1151. But nowhere does the district court consider or weigh an allegation premised upon delayed transfer.[1] Of course, I view this omission as completely unsurprising. Why should the district court have addressed a claim that was not pleaded and was not presented to the district court for disposition on summary judgment? Indeed, it would have been improper for the district court to grant summary judgment on any matter sua sponte, and without notice to the non-moving party. See Fed.R.Civ.P. 56(c); Otis Elevator Company v. George Washington Hotel Corp., 27 F.3d 903, 910 (3d Cir.1994).
 
 
 91
 If the transfer delay had been pleaded as part of a Sec. 1983 claim, and had been dismissed by the district court on summary judgment sua sponte, without notice, and without discussion, one would expect an appeal on that ground. What has Pinaud asked us to do on appeal? His briefs tell us that (in addition to the malicious prosecution claim) the sole claim under Sec. 1983 that Pinaud wished us to address on appeal was his conspiracy claim:
 
 
 92
 [T]he District Court employed an overly restrictive view of the function for which the defendant prosecutors are sued. The lower court analyzed each action Pinaud offered to show that the out-of-court conspiracy existed, rather than the conspiracy itself.
 
 
 93
 . . . . .
 
 
 94
 Toward this end, Pinaud alleged that the prosecutors committed various acts, both in court and out, which indicate that the conspiracy was at work. However, Pinaud carefully avoided suing defendants fo[r] what they did in court. He used those acts only as evidence of the existence of a conspiracy....
 
 
 95
 The District Court ... mistook the acts that prove the existence of the conspiracy which harmed Pinaud, for the harm itself.
 
 
 96
 Brief of Appellant at 19-21. The majority opinion concludes that this conspiracy theory was properly rejected by the district court. However, by isolating one overt act evidencing the conspiracy, and evaluating the transfer delay as a separate claim, the majority opinion does just what Pinaud argues on appeal the district court should not have done.
 
 
 97
 In his brief and reply brief, Pinaud barely references the overt acts listed in Count Three of his complaint and, where he does so, he makes no mention of the transfer delay. See Brief of Appellant at 31 and Reply Brief at 14-15. The majority opinion recites that "Pinaud relies almost exclusively on conspiracy notions in seeking to defeat the individual defendants' immunity". Ante at 1149. The majority finds this "[s]omewhat surprising[ ]," ante at 1149, but I do not. The various acts alleged in the complaint, the five acts addressed by the district court, the five acts addressed by Pinaud on appeal, and what the majority opinion calls the "roughly[ ] seven acts by the defendants that Pinaud alleges wrongly harmed him," ante at 1149, are nothing more or less than predicate acts in the conspiracy claim. The district court properly dismissed the conspiracy claim, as the majority opinion holds. Ante at 1149.
 
 
 98
 What the majority opinion does is to take one of these predicate acts and recast it as a claim under Sec. 1983. The majority opinion therefore remands for proceedings on a claim that was never pleaded, that (having never been pleaded) was not the subject of the summary judgment motion, that (having not been raised in the motion) was never addressed in the district court opinion, that (having never been addressed) can scarcely have been dismissed, that (having not been dismissed) was necessarily withdrawn and that (for all these good reasons) was never presented to us on appeal.
 
 II
 
 99
 According to the majority opinion, the delayed transfer can be the basis for a Sec. 1983 claim because the return transfer to federal prison is an administrative act rather than a prosecutorial act protected by absolute immunity. Yet, as the majority opinion concedes, Pinaud "makes no effort, but for one or two purely conclusory statements, to dispute the District Court's determinations that ... all of the defendants' distinct acts are properly regarded as 'prosecutorial' rather than as 'investigative' or 'administrative'." Ante at 1149.
 
 
 100
 This delayed transfer claim originates in the majority opinion. The majority opinion in turn relies entirely upon Allen v. Lowder, 875 F.2d 82, 85-86 (4th Cir.1989), as authority for the idea that a Sec. 1983 claim can be premised upon the delay in transferring Pinaud back to federal prison. In Allen, the prosecutor failed to effect the inmate's release following the dismissal of all criminal charges against him, thereby delaying the plaintiff's ultimate freedom. Allen deemed this release from custody to be an administrative function that is distinct from the prosecutor's role as prosecutor. Here, the prosecutor arranged the transfer of Pinaud from federal custody to state prison in order to facilitate his possible retrial on the state charges. The majority recognizes that this transfer from federal prison to state prison was a prosecutorial act. Ante at 1150. This arrangement was in the nature of a bailment to take Pinaud from federal custody and to return him there. State prosecutors who require the transfer of federal prisoners cannot hope to perform that prosecutorial function without (a) undertaking to hold and return the prisoner to federal custody and (b) making good on that undertaking. Transferring Pinaud back to federal custody was therefore a prosecutorial obligation and a prosecutorial function.
 
 
 101
 The majority's reliance upon Allen recognizes no distinction between (a) Pinaud's discharge to federal prison and (b) Allen's discharge home. The distinction between these two events--which would not be lost on any inmate--could confuse only persons who are at large.[2] The law is quite clear that federal prisoners may be housed in state prisons. See 18 U.S.C. Sec. 4002; 18 U.S.C. Sec. 3621(b); Rosenberg v. Carroll, 99 F.Supp. 630, 632 (S.D.N.Y.1951) ("The Attorney General may transfer a convict from a federal to a state prison without notice to or consent of the convict."). Indeed, nothing in the Constitution prevents prisoners in either the state or federal system from being detained in privately operated prisons, see Ward A. McAfee, Tennessee's Private Prison Act of 1986: An Historical Perspective With Special Attention to California's Experience, 40 Vand.L.Rev. 851 (1987); David N. Wecht, Breaking the Code of Deference: Judicial Review of Private Prisons, 96 Yale L.J. 815 (1987), or in other jurisdictions, see 18 U.S.C. Sec. 4003, or in other countries for that matter. Putting aside the invalid premise that a prisoner's claim can be based on delayed transfer from one jail to another, one wonders whether any harm cognizable in law can arise from such a delay. See Meachum v. Fano, 427 U.S. 215, 225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976); Klos v. Haskell, 48 F.3d 81, 86 (2d Cir.1995) ("the [Supreme] Court has held that an inmate has no inherent liberty interest ... in remaining in one correctional institution rather than another"). What instruction would one give a jury charged with ascertaining injury or fixing damages? What background would qualify an expert to illuminate these issues for the jury?
 
 
 102
 Footnote 9 in the majority opinion, ante at 1152, broadly intimates that, at any trial of the remanded claim, the plaintiff may proffer evidence of (a) the acts and claims held by this Court to have been properly dismissed by the district court, together with (b) the claims and allegations that the plaintiff has voluntarily withdrawn. To say the least, this strategy is in tension with Singleton v. City of New York, 632 F.2d 185 (2d Cir.1980), cert. denied, 450 U.S. 920, 101 S.Ct. 1368, 67 L.Ed.2d 347 (1981), which bars use of a conspiracy theory to revive time-barred claims. Id. at 192 ("The existence of a conspiracy does not postpone the accrual of causes of action arising out of the conspirators' separate wrongs. It is the wrongful act, not the conspiracy, which is actionable...."). Footnote 9 points a way around Singleton, so that time-barred (and withdrawn) claims may be used to repair the deficiencies of a surviving claim and perhaps furnish an incitement to punitive damages. It will be for the district court on remand to resolve these issues in light of Singleton, Federal Rule of Evidence 403, and other considerations.
 
 III
 
 103
 The majority's unnecessary discussion of Monell v. Dep't of Social Services of City of New York, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); Singleton and Eagleston v. Guido, 41 F.3d 865 (2d Cir.1994), leads up to the observation that "a cause of action against [a] municipality does not necessarily accrue upon the occurrence of a harmful act, but only later when it is clear, or should be clear, that the harmful act is the consequence of a county 'policy or custom.' " Ante at 1157. That discussion is demonstrably dictum because, as the majority acknowledges, Pinaud's counsel has conceded that he knew, months before the statute of limitations expired, each fact relied upon to establish the "policy or custom" underlying the supposed Sec. 1983 claim. Ante at 1157.
 
 
 104
 The majority's statute-of-limitations view is not consonant with our most recent pronouncement on the issues addressed by Monell and Singleton. Eagleston makes clear that a Sec. 1983 cause of action accrues when " 'the plaintiff becomes aware that [s]he is suffering from a wrong for which damages may be recovered in a civil action.' " Eagleston, 41 F.3d at 872 (quoting Singleton, 632 F.2d at 192 (alteration in Eagleston )). In Eagleston this "wrong" consisted of the beating and stabbing of the plaintiff by her husband, allegedly caused by the failure of the police to protect her. The cause of action in Eagleston accrued when the plaintiff was assaulted, not at some later date when the plaintiff came to realize that the police officers were acting under color of state law when they failed to protect her. Although a Sec. 1983 complaint against a state or subdivision must plead that the wrongful act is pursuant to a governmental "policy or custom," the accrual of the claim is not delayed until that realization is brought home. A party who suffers a potentially compensable injury is generally on notice from that time to make the inquiries necessary to support at least a pleading on information and belief as to such things as the defendant's custom, policy, practice, notice, status or state of mind.
 
 
 
 [1]
 To facilitate the prosecution of these federal charges, Pinaud was transferred from state custody to federal custody from January to October of 1985. Pinaud alleges that this time that he spent in federal custody contributed to his belief that he was receiving federal credit for the time being served on his state sentence
 
 
 [2]
 Through an action in federal court, Pinaud tried, but ultimately failed, to obtain an order forcing federal prison officials to give him credit for time served on the vacated state conviction. See Pinaud v. James, 851 F.2d 27 (2d Cir.1988)
 
 
 [3]
 Pinaud does not address any aspects of the District Court's holdings concerning his state claims against the individual defendants, and thus we have no occasion to consider them
 
 
 [4]
 The District Court's evaluation of the issue of absolute immunity before assessing whether Pinaud had sufficiently alleged a constitutional violation comports with the approach implicitly endorsed by the Supreme Court in Buckley v. Fitzsimmons, --- U.S. ----, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993). In Buckley, the Court simply assumed that the petitioner had alleged a constitutional violation in order to address the issue of absolute immunity. See --- U.S. at ----, 113 S.Ct. at 2609. Cf. Siegert v. Gilley, 500 U.S. 226, 231-33, 111 S.Ct. 1789, 1792-94, 114 L.Ed.2d 277 (1991) (suggesting that, when a defendant asserts a defense of qualified immunity, a court should not assume the existence of a constitutional violation, but rather should begin by considering whether the complaint sufficiently asserts such a violation)
 
 
 [5]
 Though not generally noted by courts, the Supreme Court's decision in Imbler itself indicates that a claim of conspiracy will not defeat absolute prosecutorial immunity. The plaintiff's claims in Imbler included an allegation of "a conspiracy among [prosecutors and police] unlawfully to charge and convict him." 424 U.S. at 415-16, 96 S.Ct. at 988. The Supreme Court did not discuss the fact that the plaintiff made this conspiracy claim, but examined only whether the underlying activities were an integral part of the judicial process. See id. at 430-31, 96 S.Ct. at 995. Evidently, then, the conspiracy allegation was not viewed as sufficient to overcome the defense of absolute prosecutorial immunity
 
 
 [6]
 Though New York law provides for a district attorney to order a prisoner's transfer from federal to state custody for purposes of a state prosecution, see N.Y.Crim.Proc.Law Sec. 580.30(2), this state law does not establish, nor can it operate to expand, what constitutes a prosecutorial function for defining the parameters of absolute prosecutorial immunity under Sec. 1983. As noted before, immunity depends on the character of the activity and not the status of the actor, see, e.g., Burns, 500 U.S. at 486, 111 S.Ct. at 1939; Sykes v. James, 13 F.3d 515, 519 (2d Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 2749, 129 L.Ed.2d 867 (1994), and thus when state law assigns administrative or investigative roles to prosecutors, prosecutors carrying out these roles can only expect the protection of qualified immunity for their actions
 
 
 [7]
 Cf. Dickerson v. Kemp, 540 So.2d 467, 470 (La.App. 1st Cir.1989) (finding in Sec. 1983 suit that prosecutor was immune for issuing a detainer and deciding not to extradite prisoner pending an indictment within the jurisdiction)
 
 
 [8]
 The dissent correctly notes that the district attorney defendants' motion only asserted absolute immunity for five sets of acts, and that the acts relating to the three-week delay in transferring Pinaud from state prison to federal prison were not among them. Nevertheless, the District Court plainly went beyond these five sets of acts when it held that the "district attorney defendants are covered by absolute immunity for all their alleged acts that plaintiff claims caused him injury except as to the allegation that defendants Henry and Holownia arranged to have plaintiff frequently transported from the Riverhead Jail to the Hauppauge Courthouse on days that his case was not on the calendar." 798 F.Supp. at 921 (emphasis added). It is clear, and not seriously disputed by the dissent, that the transfer claim was among the individual defendants' "alleged acts that plaintiff claims caused him injury." See Am.Compl. pp 4, 75, 86, 91, 93. Therefore, the only reasonable reading of the District Court's opinion is that the transfer claim was dismissed below. Since Pinaud withdrew only those claims not dismissed by the District Court, that claim is an element of this appeal
 The dissenting opinion, when it suggests that "the sole claim under Sec. 1983 that Pinaud wished us to address on appeal was his conspiracy claim," seems also to argue that Pinaud failed to preserve the transfer claim. But Pinaud clearly states both in his initial brief and in his reply brief--albeit without extended discussion--that none of the individual alleged acts by the district attorney defendants are covered by absolute immunity. See Brief of the Appellant at 31-32 (chronicling distinct acts and arguing "that these acts were not intimately associated with the judicial phase of the criminal process"); Reply Brief at 14-15 (asserting that even if the conspiracy claim was barred, "absolute immunity still would not apply to the component acts alleged in the complaint"). We should not hold, as the dissent seemingly urges, that an appellant has failed to preserve a claim simply because the claim, though made, is not argued at length or because other claims seem more important to the appellant. We note that the dissenting opinion, despite its assertion that Pinaud's "sole claim" on appeal was his conspiracy claim, does not argue with our discussion of the other distinct acts by the individual defendants, those that we find to be covered by absolute immunity.
 
 
 [9]
 In holding that Pinaud's claim based upon the prosecutors' alleged involvement in delaying his transfer back into federal custody is not precluded by the defense of absolute immunity, we do not express any opinion concerning whether Pinaud's allegations sufficiently assert a constitutional violation or might overcome a defense of qualified immunity. The dissenting opinion faults us for remanding the claim to the district court instead of rejecting it outright on grounds other than absolute immunity--e.g., that Pinaud's retention in state prison could not be a constitutional deprivation. These issues were not briefed here or below, and we thus leave their initial consideration to the District Court. See Buckley, --- U.S. at ----, 113 S.Ct. at 2619 (remanding the case and leaving to the court of appeals to address in the first instance petitioner's due process claims, the "precise contours" of which were "unclear" and "were not addressed below"); Lowder, 875 F.2d at 86 n. 3 (remanding similar issues to district court for initial consideration). The District Court should determine in the first instance whether any or all of Pinaud's allegations about the individual defendants' conduct may be relevant to the existence of a constitutional deprivation and to the availability of qualified immunity
 
 
 [10]
 The state charges against Pinaud were finally dismissed on October 19, 1988, and thus the alleged three-week delay in his transfer back into federal custody occurred in October and November of 1988, well after the key date--June 17, 1988--before which time claims would be barred by virtue of the statute of limitations. See infra Part II.B. Ironically, as will be discussed in connection with the claims against the County of Suffolk, since the District Court's opinion did not dismiss Pinaud's claim against the County based on the allegedly delayed transfer, and since Pinaud subsequently withdrew all claims not dismissed by the District Court's opinion, Pinaud can pursue a claim based on the delayed transfer only against the district attorneys and not against the County
 
 
 [11]
 After filing his action, Pinaud's counsel sought to serve defendant Freundlich by mail. Three months later, Freundlich's attorney responded in a letter to Pinaud which explained that Freundlich received the complaint, but was not admitting that service was proper. Pinaud then filed a motion seeking a default judgment against Freundlich. Without ruling on whether service had been proper, the District Court decided, in light of the large sum sought by Pinaud, the disputable merits of his claims, and the lack of any prejudice from Freundlich's failure to answer, that it was appropriate to deny Pinaud's motion for a default judgment
 Making a cursory argument, Pinaud now claims that the District Court erred in denying his motion for a default judgment. According to Pinaud, Rule 55(a) of the Federal Rules of Civil Procedure required the Court to enter a default judgment once it was clear that Freundlich had been properly served and failed to appear. However, Pinaud misunderstands a crucial distinction between the entry of a default and the entry of a default judgment. Rule 55(a) does provide that "the clerk shall enter [a] party's default," if that party has "failed to plead or otherwise defend ... and that fact is made to appear by affidavit or otherwise," Fed.R.Civ.P. 55(a). However, the "entry of a default is largely a formal matter and is in no sense a judgment by default." 6 James W. Moore et al. Moore's Federal Practice p 55.03, at 55-21 (2d ed. 1994). In a situation such as this one, "a default judgment may be obtained only by application to the court." Id., p 55.05, at 55-27.
 The District Court clearly understood and properly applied the appropriate factors that are to guide its discretionary decision to enter a default judgment. See id., p 55.05 (detailing factors). The decision of the District Court to avoid ruling upon the propriety of the service was wise, since the sound exercise of its discretion led it to conclude, correctly, that a default judgment was not justified in any event. Since the District Court's decision was not only not "clearly wrong," see Eagle Assocs. v. Bank of Montreal, 926 F.2d 1305, 1307-08 (2d Cir.1991), but in fact quite right, we affirm the Court's denial of Pinaud's motion for a default judgment against defendant Freundlich.
 
 
 [12]
 The District Court ruled that all of Pinaud's claims against the County of Suffolk based on state law were to be dismissed due to his failure to file a timely notice of claim under state law. See Pinaud, 798 F.Supp. at 925. As with the state law claims against the individual defendants, because Pinaud has chosen not to address this holding in his submissions or at argument, the merits of this ruling by the District Court are not before us on appeal
 
 
 [13]
 As noted before, because the allegedly unnecessary delay in Pinaud's transfer back into federal custody took place after June 17, 1988, Pinaud's claim against the County based on this alleged delay was not dismissed by the District Court's opinion. As a result and counter-intuitively, this viable cause of action against the County was eliminated from the case--along with all the other claims that survived under the District Court's rulings--by Pinaud's stipulation to withdraw all claims not dismissed by the District Court's opinion
 
 
 [14]
 In Baez v. Hennessy, 853 F.2d 73 (2d Cir.1988), cert. denied, 488 U.S. 1014, 109 S.Ct. 805, 102 L.Ed.2d 796 (1989), this Court determined that "[w]hen prosecuting a criminal matter, a district attorney in New York State ... represents the State not the county," id. at 77, and consequently ruled that "a district attorney's misconduct in prosecuting an individual could not give rise to municipal liability." Walker, 974 F.2d at 301 (describing the holding of Baez ). On its own terms, Baez might seem to suggest that a plaintiff simply cannot state a Sec. 1983 malicious prosecution claim against a New York county based upon the actions of district attorneys in bringing a prosecution
 However, in Gentile v. County of Suffolk, 926 F.2d 142 (2d Cir.1991), we limited Baez by ruling that a New York municipality could be held liable, in a Sec. 1983 malicious prosecution claim, when a county district attorney had a "long history of negligent disciplinary practices regarding law enforcement personnel, which gave rise to the individual defendants' conduct in promoting the malicious prosecution of plaintiffs." Id. at 152 n. 5.
 Reviewing the holdings of Baez and Gentile, we have explained that "[w]here a district attorney acts as the manager of the district attorney's office, the district attorney acts as a county policymaker." Walker, 974 F.2d at 301. Consequently, as long as a plaintiff's "claims center[ ] not on decisions whether or not, and on what charges, to prosecute but rather on the administration of the district attorney's office," Ying Jing Gan, 996 F.2d at 536, there can be liability against a New York county for an alleged malicious prosecution. See id.; Walker, 974 F.2d at 301; Gentile, 926 F.2d at 152 n. 5.
 
 
 [15]
 We are not alone in our reluctance to take on Albright. Many other circuits have similarly avoided addressing the impact of Albright on their extant malicious prosecution law when it was plain that a plaintiff could not have satisfied pre-Albright requirements, which were not clearly done away with by Albright. See, e.g., Eubanks v. Gerwen, 40 F.3d 1157, 1161 n. 2 (11th Cir.1994); Johnson v. Louisiana Dep't of Agriculture, 18 F.3d 318, 321 n. 2 (5th Cir.1994); Haupt v. Dillard, 17 F.3d 285, 290 n. 4 (9th Cir.1994)
 
 
 [16]
 We are always skeptical of broad and unspecified claims of conspiracy, and Pinaud's allegations are quite broad and unspecified. It is worth noting, however, that Pinaud does claim that the Trager Commission Report, which describes certain disreputable conduct occurring in the Suffolk County District Attorney's Office, provides support for his conspiracy allegations
 
 
 [17]
 The dissent intimates that our determination of when the claim against the County accrues is inconsistent with this Court's decision in Eagleston. But the discussion in Eagleston in no way forecloses delayed accrual of causes of action under Sec. 1983 when the circumstances of the case warrant it. Moreover, and despite the dissent's implication to the contrary, Eagleston 's statute-of-limitations discussion only addresses issues relating to the accrual of claims against individual defendants, see 41 F.3d at 870-72, claims that do not require a "policy or custom," as do claims against a municipality. The issue before us, instead, is precisely that of when Pinaud knew or should have known enough to claim the existence of a "policy or custom" so that he could sue the County
 
 
 [18]
 Though not raised by Pinaud, we note that the Supreme Court's recent decision in Heck v. Humphrey, --- U.S. ----, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), does not affect our ruling. In Heck, the Supreme Court held that a plaintiff seeking "damages for [an] allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid" does not have a cognizable claim under Sec. 1983 until his or her conviction or sentence has been in some way "officially" voided. --- U.S. at ----, 114 S.Ct. at 2372. As the Supreme Court itself explained, one necessary consequence of this holding is that "a Sec. 1983 cause of action for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated." Heck, --- U.S. at ----, 114 S.Ct. at 2374. Assuming that Heck applies to Pinaud's claims, these would still be barred because his original conviction and sentence was invalidated by the state in 1987, long before the date when an action would be timely
 
 
 [1]
 The majority's footnote 8 deems it plain that the district court "went beyond these five sets of acts" by its reference to " 'all [the defendants'] alleged acts that plaintiff claims caused him injury' ". This reference to "all ... alleged acts" comes at the conclusion of the district court's discussion of absolute immunity. As I have pointed out, the preamble language on page 918 limits this entire discussion to the five (or six) specifically enumerated alleged acts. The district court's use of "all ... alleged acts" thus refers back in the district court opinion to these five (or six) acts and can refer to no others. Of course, the alleged transfer delay is not among the enumerated acts
 
 
 [2]
 The majority eases the way for this ruling through dictum addressing the so-called "bullpen therapy" claim. The majority suggests that the district court declined to dismiss the bullpen claim on summary judgment presumably because the district court determined that act was not subject to prosecutorial immunity. Ante at 1150-51. The majority opinion then goes on to approve this ruling that the district court never made. Because the district court failed to dismiss the bullpen claim, it is not before us and we have no occasion to address it